[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10587

_____

In re: Fundamental Long Term Care, Inc.,

Debtor.

_____

ESTATE OF ARLENE TOWNSEND,
ESTATE OF ELVIRA NUNZIATA,
ESTATE OF JAMES HENRY JONES,
ESTATE OF JOSEPH WEBB,
ESTATE OF OPAL LEE SASSER,
ESTATE OF JUANITA JACKSON,
Petitioning Creditor,

Plaintiffs-Appellants,

*versus*

STEVEN M. BERMAN, Esq.,
SHUMAKER, LOOP & KENDRICK, LLP,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-00956-VMC,
Bkcy No. 8:11-bk-22258-MGW

_____

Before LAGOA, BRASHER, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Section 327(a) of the United States Bankruptcy Code, titled "Employment of professional persons," states that "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties." 11 U.S.C. § 327(a). Rule 2014 of the Federal Rules of Bankruptcy Procedure implements the disinterestedness provision of this section by requiring the trustee, in seeking court approval of the employment of a professional, to

disclose "the person's connections with the debtor, creditors, [or] any other party in interest."[1]  Fed. R. Bankr. P. 2014(a).

The bankruptcy proceeding underlying this case, *In re Fundamental Long Term Care, Inc.*, was initiated by Wilkes & McHugh, P.A. ("Wilkes"), on December 5, 2011, when it filed an involuntary petition in the Bankruptcy Court for the Middle District of Florida under Chapter 7 of the Bankruptcy Code for relief against Fundamental Long Term Care, Inc. ("FLTCI") on behalf of the Estate of Juanita Jackson, deceased.  The Jackson Estate, in a wrongful death tort action, had obtained judgments of $55 million against Trans Health, Inc. ("THI") and Trans Health Management, Inc. ("THMI") each, on July 22, 2010.  In a post-judgment motion, the Jackson Estate obtained a default amended judgment on

---

[1] Fed. R. Bankr P. 2014(a) states that the trustee, in applying for court approval of the employment of a professional, must state:

> to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.  The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

A professional must disclose all connections to parties in interest "that are not so remote as to be *de minimis*."  *In re Fullenkamp*, 477 B.R. 826, 834 (Bankr. M.D. Fla. 2011) (quoting *In re Leslie Fay Cos.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994)).

September 13, 2011, making FLTCI liable for the total $110 million award, along with THI and THMI—which were each liable for their respective $55 million judgment.  But the Jackson Estate was unable to collect on the judgments due to a massive "bust-out" scheme[2] designed and executed in March 2006 to avoid paying the judgments.[3]

The Chapter 7 case became operative on January 12, 2012, when the Bankruptcy Court issued an "Order of Relief" after FLTCI—now the Debtor—failed to respond to the Jackson Estate's Chapter 7 petition.  In June 2012, the trustee of the Debtor's estate (the "Trustee") employed Steven M. Berman and Shumaker, Loop & Kendrick, LLP ("Shumaker")[4] as special litigation counsel.  They served in that capacity until December 2015, following the distribution of the proceeds of a compromise presented to the Bankruptcy Court for approval in March 2015.

---

[2] While this opinion later explains the bust-out scheme in detail, *see infra* part II.B, the gist of the scheme is that, in a series of transactions, THI separated THMI's assets and liabilities, and then hid those assets.

[3] Why Wilkes had the Jackson Estate file a petition for Chapter 7 bankruptcy relief against FLTCI and not THMI and THI will become apparent as this opinion unfolds.

[4] Berman was a Shumaker partner.  Rule 2014(b) provides in relevant part:

> If, under the Code and this rule, a law partnership . . . is employed as an attorney . . . or if a named attorney . . . is employed, any partner, member, or regular associate of the partnership . . . or individual may act as attorney . . . without further order of the court.

On June 4, 2018, Wilkes, representing the creditors of the Debtor's estate—namely the Jackson Estate and five other Probate Estates (collectively, the "Probate Estates")—moved the Bankruptcy Court *nunc pro tunc* to disqualify Shumaker as special litigation counsel and require it to disgorge the compensation it had received for its services.  According to Wilkes, when the Trustee employed Shumaker in June 2012, it was not disinterested as required by § 327(a).  Moreover, Shumaker failed to timely disclose its "connections with the debtor, creditors, [or] any other party in interest"—connections that revealed its disinterestedness—as required by Rule 2014.  The Bankruptcy Court denied Wilkes's motion.  It did so without an evidentiary hearing and based on the record of the bankruptcy case.[5]

---

[5] The Bankruptcy Court described the record of the case prior to March 20, 2014, in a Memorandum Opinion on Motion to Compromise and Motions for Permanent Injunctive Relief as "exceedingly complex." *In re Fundamental Long Term Care, Inc.,* 527 B.R. 497, 501 n.5 (Bankr. M.D. Fla. 2015).  "The Court had nearly 80 days of hearings in this case." *Id.*  The issues raised in those hearings resulted in 17 reported decisions: *In re Fundamental Long Term Care, Inc.*, 489 B.R. 451 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 492 B.R. 571 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 493 B.R. 613 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 493 B.R. 620 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 494 B.R. 548 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 500 B.R. 140 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 500 B.R. 147 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 501 B.R. 770 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 501 B.R. 784 (Bankr. M.D. Fla. 2013); *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 508 B.R. 224 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 509

The Probate Estates appealed the Bankruptcy Court's decision.  On February 27, 2020, the District Court affirmed the Bankruptcy Court's order except on the issue of whether Berman had committed a disclosure violation pursuant to Rule 2014.  The District Court then remanded the case to the Bankruptcy Court so it could decide whether Berman violated Rule 2014's disclosure requirements.  On remand, the Bankruptcy Court held that Berman's omissions did not warrant sanctions under Rule 2014.  *In re Fundamental Long Term Care, Inc.*, 614 B.R. 753 (Bankr. M.D. Fla. 2020).  On the Probate Estates' appeal, the District Court affirmed.  *In re Fundamental Long Term Care, Inc.*, No. 8:20-cv-956, 2021 WL 222779 (M.D. Fla. Jan. 22, 2021).

The Probate Estates now appeal the District Court's decision, contending that the Bankruptcy Court abused its discretion in denying their motion.  With the benefit of oral argument and having examined the record before the Bankruptcy Court, we affirm.

We divide our discussion as follows.  In part I, we consider the relevant events that took place prior to the Chapter 7 Trustee's appointment and the administration of the bankruptcy estate prior to Berman and Shumaker's employment as special litigation

---

B.R. 387 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 509 B.R. 956 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 512 B.R. 690 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 515 B.R. 352 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 515 B.R. 857 (Bankr. M.D. Fla. 2014); *In re Fundamental Long Term Care, Inc.*, 515 B.R. 874 (Bankr. M.D. Fla. 2014).

counsel.[6]  Part II begins with the Trustee's application to employ Berman and Shumaker; it then describes what they learned about the bust-out scheme, Wilkes's litigation in response to the scheme, and the conflict between the Trustee and counsel for the fraudulent transferees over control of the defense strategy in state court. Part III deals with the principal adversary proceedings held in the case, including the Bankruptcy Court's decision to treat THMI as if it had been included as a debtor in the Jackson Estate's petition for Chapter 7 relief against FLTCI and the compromises that resolved those proceedings.  Part IV takes up Wilkes's motion to disqualify Shumaker and for disgorgement of the attorney's fees Shumaker received, the Bankruptcy Court's rulings on the motion, and the District Court's review of those rulings.  Part V concerns the present appeal.

## I.

On January 23, 2012, the Bankruptcy Court appointed Beth Ann Scharrer Trustee of the Debtor's (FLTCI's) estate.  Two days later, the Bankruptcy Court approved her application to employ Allan C. Watkins as her general counsel.  On February 22, the Trustee, through Watkins, moved the Bankruptcy Court to enter an order "authorizing the Trustee, on behalf of the [C]hapter 7 estate . . . . to borrow up to Ten Thousand Dollars . . . from Wilkes & McHugh, P.A. . . . under 11 U.S.C. § 503(b)(1) as an administrative expense."  The motion stated in relevant part:

---

[6] In this opinion, we refer to Berman and Shumaker interchangeably.

> No schedules have been filed by the Debtor, and no appearance has been made by counsel for the Debtor. No response was made by or on behalf of the Debtor, and no schedules or statement of financial affairs have been filed. As such, there is little information in the record upon which the Trustee can rely to determine the assets and liabilities of the Debtor.
>
> . . .
>
> Wilkes & McHugh represents a number of creditors asserting claims against the Debtor, including the Estate of Juanita Jackson, the petitioning creditor. The Lender [Wilkes] has agreed to loan to the [Debtor's] Estate up to $10,000.00, allowable as an administrative expense under § 503(c)(1) of the Bankruptcy Code.
>
> . . .
>
> The Debtor has not prepared any schedules, list of creditors, or statement of financial affairs. The Trustee needs to conduct discovery, including by deposition testimony as necessary, to produce the information necessary or available. The likely witnesses with knowledge of the Debtor's business affairs are located out of the State of Florida, so expenses would include travel costs, lodging, and meals as well.

Trustee's Motion for Final Approval of Postpetition Financing at 2–3, *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. Feb. 22, 2012). The Bankruptcy Court held a hearing on the motion on March 28, 2012, and approved it in an order dated April 6, 2012.

21-10587                Opinion of the Court                    9

At the same time, Wilkes was involved in the prosecution of, or in post-judgment proceedings in, five of the six wrongful death cases it had brought on behalf of the Probate Estates in state courts—five in Florida and one in Pennsylvania.[7] The six Probate Estate plaintiffs were the Probate Estate of Juanita Jackson,[8] whose case had been prosecuted to final judgment pre-petition, and the Probate Estates of Elvira Nunziata,[9] Joseph Webb,[10] James Henry Jones,[11] Opal Lee Sasser,[12] and Arlene Townsend,[13] whose cases were pending trial in state court.[14] THMI was a defendant in all six cases, while THI was a defendant in all the cases except *Nunziata*.

---

[7] The lawsuits alleged negligence and frequently other tort law theories of recovery. We refer to the theories collectively under a wrongful death rubric.

[8] *Estate of Juanita Jackson v. Briar Hill, Inc.*, No. 53-2004CA-003229 (Fla. Cir. Ct. filed July 30, 2004), in the Circuit Court of Polk County, Florida.

[9] *Estate of Elvira Nunziata v. Pinellas Park Nursing Home, Inc.*, No. 05-8540CI (Fla. Cir. Ct. filed Dec. 23, 2005), in the Circuit Court of Pinellas County, Florida.

[10] *Estate of Joseph Webb v. Gainesville Health Center, Inc.*, No. 01-06-CA-2418 (Fla. Cir. Ct. filed June 16, 2006), in the Circuit Court of Alachua County, Florida.

[11] *Estate of James Henry Jones v. TFN Health Care Investors, Inc.,* No. 06-06672 (Pa. Ct. Com. Pl. filed July 17, 2006), in the Court of Common Pleas of Montgomery County, Pennsylvania.

[12] *Estate of Opal Lee Sasser v. Briar Hill, Inc.*, No. 06CA-3511 (Fla. Cir. Ct. filed Sept. 6, 2006), in the Circuit Court of Polk County, Florida.

[13] *Estate of Arlene Townsend v. Briar Hill, Inc.*, No. 53-2009CA-001025 (Fla. Cir. Ct. filed January 29, 2009), in the Circuit Court of Polk County, Florida.

[14] We refer to the cases in short-hand, e.g., *Jackson*, *Nunziata*, etc.

Within a matter of weeks of her appointment, the Trustee became aware of the circumstances that led to Wilkes filing the Chapter 7 petition against FLTCI on December 5, 2011, and some of the untoward legal consequences that resulted from filing the petition against FLTCI instead of THMI. Importantly, the Trustee learned:

(1)      On July 22, 2010, an "empty-chair" jury trial[15] was held in *Jackson*,[16] and the plaintiff obtained verdicts—and then judgments—of $55 million against each of THI and THMI.[17] Three

---

[15] An empty-chair trial occurs when the defendant does not participate in the trial. In *Jackson,* defense counsel for THI and THMI—Quintairos, Prieto, Wood & Boyer, P.A.—moved the court on April 29, 2010, for leave to withdraw as counsel for THI and THMI. The state trial court heard their motion at a pretrial conference on May 18 and granted the motion on June 4.

[16] The case was tried on the Jackson Estate's fifth amended complaint filed on July 31, 2009. The defendants were: Briar Hill, Inc. (the owner and operator of Integrated Health Services at Auburndale a/k/a Auburndale Oaks Healthcare Center, the nursing home in which Juanita Jackson once resided); Lyric Health Care Holdings III, Inc; Lyric Health Care LLC; TFN Healthcare Investors, LLC; IHS Acquisition No. 153, Inc.; Alliance Health Services, Inc.; Integrated Health Services, Inc.; THMI; THI; Daniel H. Beeler; Richard Kuhlmeyer; Rebecca Bachman; and Barbara Brown (the director of nursing at Auburndale Oaks Healthcare Center). Auburndale Oaks and Lyric played a role in the Probate Estates' motion to disqualify Shumaker as discussed *infra* part IV.

[17] The Florida Second District Court of Appeal subsequently referred to the judgments as "default judgment[s]" handed down "[a]fter [the plaintiff] settl[ed] with eleven defendants." *Fundamental Long Term Care Holdings, LLC v. Estate of Jackson ex rel. Jackson-Platts*, 110 So. 3d 6, 7 (Fla. 2d Dist. Ct. App. 2012).

21-10587                Opinion of the Court                11

weeks later, on August 13, Wilkes, in an effort to discover THI and THMI's assets to satisfy the $55 million judgments, moved the trial court pursuant to Florida Rule of Civil Procedure 1.560(b)[18] for an order requiring THI and THMI to complete Form 1.977 as required by that rule. The state trial court granted the motion four days later. Over the next three months, Wilkes noticed several depositions in aid of execution but was unable to discover enough assets to satisfy the judgments.

(2) By December 2010, Wilkes discovered why it was unable to obtain satisfaction of the Jackson Estate's $55 million judgment against THMI. Those in control of THMI had THMI transfer its assets to Fundamental Long Term Care Holdings, LLC ("FLTCH") in March 2006, in the execution of a fraudulent "bust-out" scheme

---

[18] Rule 1.560 states in pertinent part:

> (a) **In General.** In aid of . . . execution the judgment creditor or the successor in interest, when the interest appears of record, may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules.

> (b) **Fact Information Sheet.** In addition to any other discovery available to a judgment creditor under this rule, the court, at the request of the judgment creditor, shall order the judgment debtor . . . to complete form 1.977, including all required attachments, within 45 days of the order or such other reasonable time as determined by the court. Failure to obey the order may be considered contempt of court.

Fla. R. Civ. P. 1.560.

that rendered THMI judgment-proof.[19]  To obtain satisfaction of the $55 million judgment against THMI, the Jackson Estate would have to sue FLTCH and any other entities that received THMI's assets as part of the bust-out scheme (collectively, the "Targets") as fraudulent transferees under Florida's version of the Uniform Fraudulent Transfer Act (the "UFTA").[20]

(3)    The prescriptive period for bringing an action under Florida's UFTA is four years.  *See* Fla. Stat. § 726.110.[21]  Florida's UFTA

---

[19] The bust-out scheme is discussed at length *infra* part II.B.

[20] Florida's UFTA, Fla. Stat. § 726.101 *et seq.*, states in relevant part:

> (1) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . . :
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (b) Without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor:
> . . .
> 2.  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105.  As indicated *infra*, the parties and the Bankruptcy Court agreed to apply the Florida UFTA rather than the comparable statutes of New York, Pennsylvania, Delaware, or Maryland.

[21] Section 726.110 states in relevant part:

> A cause of action with respect to a fraudulent transfer . . . under ss. 726.101-726.112 is extinguished unless action is brought:

21-10587                Opinion of the Court                13

has a statute of repose, not a statute of limitations.[22] The four-year period in which the Jackson Estate could sue FLTCH and the Targets expired in March 2010. Nonetheless, under Florida's UFTA, the prescriptive period would extend for one year following the

> (1) Under s. 726.105(1)(a), within 4 years after the transfer was made . . . or, if later, within 1 year after the transfer . . . was or could reasonably have been discovered by the claimant.

[22] In *National Auto Service Centers, Inc. v. F/R 550, LLC*, the Florida Second District Court of Appeal characterized Fla. Stat. § 726.110 as a statute of repose. 192 So. 3d 498, 509 (Fla. 2d Dist. Ct. App. 2016). Because the text of Fla. Stat. § 726.110 refers to *extinguishing* a cause of action rather than barring the remedy, the court of appeal concluded that Fla. Stat. § 726.110 is a statute of repose based on its plain text. *Id.* at 510. In *CTS Corp. v. Waldburger*, the United States Supreme Court noted that statutes of limitations are subject to equitable tolling, but statutes of repose are not and "generally may not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control." 573 U.S. 1, 9, 134 S. Ct. 2175, 2183 (2014). The Supreme Court explained that because statutes of repose dictate the time period after which a defendant will not face liability, equitable tolling is not applicable:

> Equitable tolling is applicable to statutes of limitations because their main thrust is to encourage the plaintiff to pursu[e] his rights diligently, and when an extraordinary circumstance prevents him from bringing a timely action, the restriction imposed by the statute of limitations does not further the statute's purpose. . . . But a statute of repose is a judgment that defendants should be free from liability after the legislatively determined period of time, beyond which the liability will no longer exist and will not be tolled for any reason.

*Id.* at 10, 134 S. Ct. at 2183 (alteration in original) (internal quotation marks and citations omitted). This Court has cited *Waldburger* favorably for the proposition that statutes of repose are not subject to equitable tolling. *See Sec'y, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883–84 (11th Cir. 2017).

Jackson Estate's discovery of the fraudulent transfer. Wilkes discovered the bust-out scheme on or before December 10, 2010, so the Jackson Estate had—at the latest—until December 10, 2011, to sue FLTCH and the Targets to obtain satisfaction of the Estate's $55 million judgment against THMI.[23]

---

[23] The fraudulent transfer occurred in New York City on March 28, 2006. A New York statute provided a cause of action for voiding the transfer. N.Y. Debt. & Cred. Law § 273. The statute did not have a prescriptive period, so New York courts used the prescriptive period applicable to actions based on fraud, N.Y. C.P.L.R. § 213, as the time bar. Under § 213, suit had to be brought "six years from the date the cause of action accrued" or, if later, "two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). Unlike Florida, where the UFTA prescriptive period was a statute of repose, New York courts considered the § 213 prescriptive period to be a statute of limitations. *See In re Borriello*, 329 B.R. 367, 372 (Bankr. E.D.N.Y. 2005). As it turned out, the Bankruptcy Court applied the Florida UFTA to THMI's fraudulent transfer of its assets.

The Bankruptcy Court did so on March 20, 2014, in ruling on the sufficiency of the fraudulent transfer claims asserted in the second amended complaint which the Probate Estates filed in the adversary proceeding they initiated against FLTCH and 15 defendants on October 1, 2013. *See infra* part III. One of the Bankruptcy Court's rulings denied the defendants' motions to dismiss the claims as time-barred. The Bankruptcy Court treated the time bar as an affirmative defense and thus upheld the sufficiency of the Probate Estates' fraudulent transfer claims. In deciding which state law governed the period for bringing fraudulent transfer claims, the Bankruptcy Court said:

> There appears to be a dispute about which law applies to the Plaintiffs' fraudulent transfer claims. According to the Plaintiffs, the law of Delaware, Florida, Maryland, and New York apply. But the Plaintiffs acknowledge the laws of those states

21-10587　　　　　　　Opinion of the Court　　　　　　　15

(4)　　　Once Wilkes discovered that it had been unable to obtain satisfaction of the Jackson Estate's judgment against THMI because of the bust-out scheme, it had two options.  Either the Jackson Estate, as a THMI judgment creditor, could sue FLTCH and the Targets pursuant to the applicable state fraudulent transfer law, or it could put THMI into Chapter 7 bankruptcy.  A trustee of THMI's estate, then, as a hypothetical THMI judgment creditor, could utilize the "strong arm" power provided by the Bankruptcy Code[24] and sue the transferees of THMI's assets pursuant to the same state fraudulent transfer law.

---

contain substantially similar elements.  So the Court will, as Ventas suggests, analyze the claims under Florida law.

*In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 380 n.25 (Bankr. M.D. Fla. 2014).  The Bankruptcy Court applied Florida law without objection.  In the end, it did not matter whether Florida or New York law governed.  The fraudulent transfer claims were either extinguished (under Florida law) or time-barred (under New York law).

[24] 11 U.S.C. § 544 provides in relevant part:

(**a**) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by–

(**1**) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists.

Wilkes pursued neither option. Instead, on December 10, 2010, Wilkes moved the *Jackson* state court for leave to implead two of the Targets—Rubin Schron and General Electric Capital Corporation ("GECC")[25]—pursuant to Fla. Stat. § 56.29,[26] for the purpose

---

As the Bankruptcy Court for the Southern District of New York previously explained,

> Section 544(a) of the [Bankruptcy] Code clothes the trustee with the mantle of a hypothetical judicial lien creditor, unsatisfied execution creditor, and a bona fide purchase for value as of the date of the filing of the bankruptcy petition. While it is federal law which provides the trustee with his "strong arm" powers, his exercise of those powers is controlled by the *substantive law* of the jurisdiction governing the property in question; here, the law of New York.

*In re Roman Crest Fruit, Inc.*, 35 B.R. 939, 946–47 (Bankr. S.D.N.Y. 1983) (emphasis added) (citing *In re Euro-Swiss Int'l Corp.*, 33 B.R. 872, (Bankr. S.D.N.Y. 1983).

[25] Wilkes believed that GECC, which was a secured creditor of THI and THMI, may have received loan payments from FLTCH and that Schron was one of FLTCH's owners.

[26] In 2010, § 56.29 provided in relevant part:

> (1) When any person or entity holds an unsatisfied judgment or judgment lien obtained under chapter 55, the judgment holder or judgment lienholder may file an affidavit so stating, identifying, if applicable, the issuing court, the case number, and the unsatisfied amount of the judgment or judgment lien, including accrued costs and interest, and stating that the execution is valid and outstanding, and thereupon the judgment holder or judgment lienholder is entitled to these proceedings supplementary to execution.

21-10587                Opinion of the Court                17

of pursuing THMI's assets.  The state court granted the motion and entered an order on December 21, 2010, requiring Schron and GECC to show cause why they should not be held liable for the payment of the $55 million judgment entered against THMI. Schron and GECC removed the § 56.29 proceeding to the United

---

(2) On such plaintiff's motion the court shall require the defendant in execution to appear before it . . . at a time and place specified by the order in the county of the defendant's residence to be examined concerning his or her *property*.

. . .

(4) Testimony shall be under oath, shall be comprehensive and cover all matters and things pertaining to the business and financial interests of defendant which may tend to show what *property* he or she has and its location.  Any testimony tending directly or indirectly to aid in satisfying the execution is admissible.  A corporation must attend and answer by an officer who may be specified in the order.  Examination of witnesses shall be as at trial and any party may call other witnesses.

(5) The judge may order *any property* of the judgment debtor, not exempt from execution, in the hands of any person or due to the judgment debtor to be applied toward the satisfaction of the judgment debt.

(6)

. . .

(b) When any . . . transfer . . . of *personal property* has been made or contrived by defendant to delay, hinder or defraud creditors, the court shall order the . . . transfer . . . to be void and direct the sheriff to take the *property* to satisfy the execution.

Fla. Stat. § 56.29 (effective June 17, 2005–June 30, 2014) (emphasis added).

States District Court for the Middle District of Florida on December 30, 2010, on the ground that the proceeding was a separate cause of action, not a proceeding ancillary to *Jackson*.[27]

Wilkes moved to remand the case under the theory that, under Florida law, a § 56.29 proceeding was "a supplementary proceeding . . . and thus was not removable." *Jackson-Platts v. Gen. Elec. Cap. Corp.*, 727 F.3d 1127, 1132 (11th Cir. 2013). On September 16, 2011, the District Court, on Wilkes's motion, remanded the proceeding to the state trial court. Schron and GECC timely appealed. *Id.* at 1133. We reversed the District Court. *Id.* at 1140.[28]

On May 16, 2011, Wilkes moved the *Jackson* state court for leave to implead FLTCH and 14 other Targets under § 56.29 for the

---

[27] The defendants removed the case under 28 U.S.C. § 1441, asserting diversity jurisdiction under 28 U.S.C. § 1332.

[28] The question presented to this Court in *Jackson-Platts* was whether a § 56.29 proceeding was ancillary to the underlying case, as Wilkes argued, or an independent cause of action like a case brought under Florida's UFTA. *Jackson-Platts v. Gen. Elec. Cap. Corp.*, 727 F.3d 1127, 1130 (11th Cir. 2013). We concluded that the Florida courts treated a § 56.29 proceeding as a separate cause of action as if brought under Florida's UFTA:

> [T]he substance of the [Jackson] Estate's legal claims is governed by Florida's [UFTA], which is undoubtedly a substantive statute that imposes liability. . . .

> Indeed, had the Estate sued [GECC] and Schron in state court under the [UFTA], the lawsuit plainly would have been a "civil action" under [28 U.S.C.] § 1441.

*Id.* at 1137.

purpose of asserting fraudulent transfer claims against them.[29] The motion also sought to join FLTCI as a defendant in the case. The state court granted the motion on May 18 and promptly issued an order requiring FLTCH and the Targets to show cause, thus placing the liability burden on the defendants. FLTCI did not appear in response to the show cause order, so on September 13, 2011, the state court—treating FLTCI as an original defendant in the case—entered an amended judgment making FLTCI jointly and severally liable with THI and THMI for their respective $55 million judgments—$110 million total.

The Targets named in Wilkes's May 16 motion objected on several grounds, including that they were beyond the reach of the Florida long-arm statute and that the state court lacked personal jurisdiction over them. The state court overruled their objections and granted Wilkes's motion. The Targets appealed the jurisdictional ruling to the Florida Second District Court of Appeal, and on November 28, 2012, that court affirmed the trial court's ruling and remanded the case for further proceedings. *Fundamental Long*

---

[29] In addition to FLTCH, Wilkes's motion sought leave to proceed against Fundamental Administrative Services, LLC ("FAS"); THI-Baltimore, Inc.; GTCR GolderRauner LLC; GTCR Partners VI, L.P.; Troutman Sanders LLP; Murray Forman; Leonard Grunstein; Edgar Jannotta; and Concepcion, Sexton & Martinez, P.A. Concepcion, Sexton & Martin was a Florida law firm, and its presence eliminated the possibility of diversity jurisdiction.

*Term Care Holdings, LLC v. Estate of Jackson ex rel. Jackson-Platts*, 110 So. 3d 6, 11 (Fla. 2d Dist. Ct. App. 2012).[30]

On December 5, 2011, Wilkes looked to the Bankruptcy Court for the Middle District of Florida for assistance. Wilkes had the Jackson Estate file an involuntary petition for Chapter 7 relief against FLTCI, not THMI.[31] Wilkes attached the Jackson Estate's $110 million judgment against FLTCI to the petition. As of the date of filing, the Jackson Estate was the only estate with a final state court judgment.

★          ★          ★

### Commentary

The record does not reveal the reason Wilkes selected December 5, 2011, as the date for filing the Chapter 7 petition against FLTCI. It could have been that the one-year extension provided by Fla. Stat. § 726.110 for filing a fraudulent transfer action against FLTCH and the Targets was about to expire. As previously discussed, that one-year period began at some point prior to December 10, 2010, when Wilkes, having learned about the transfer of THMI's assets to FLTCH, moved the *Jackson* court for leave to

---

[30] The Trustee, and later Shumaker, were of course unaware of the Second District Court of Appeal's decision until late 2012. From Shumaker and the Trustee's point of view, a § 56.29 proceeding—like the one brought against Schron and GECC—would be useless as a means of collecting on the Jackson Estate's judgment against THMI.

[31] Wilkes filed a formal appearance for the Jackson Estate the same day along with Stichter, Riedel, Blain & Prosser, P.A.

21-10587                  Opinion of the Court                  21

implead Schron and GECC as fraudulent transferees pursuant to § 56.29. Wilkes may have thought that a potential trustee of FLTCI's Chapter 7 estate, exercising a trustee's strong-arm power as a hypothetical FLTCI judgment creditor, could pursue FLTCH and the Targets with an UFTA cause of action—the same cause of action the Jackson Estate could bring against the transferees in state court.[32] For that potential trustee to pursue the transferees as a hypothetical FLTCI creditor, the Bankruptcy Court would have to treat FLTCI and THMI as one entity. Treating them as one could not have been part of Wilkes's litigation strategy at that time. Its steadfast position was that FLTCI and THMI were entirely separate entities. Wilkes had to assume that position to avoid violating the automatic stay that issues as a result of filing a Chapter 7 petition pursuant to 11 U.S.C. § 362(a).

So why did Wilkes put FLTCI into bankruptcy instead of THMI? The record yields several possibilities. One was that Wilkes wanted to continue prosecuting the Probate Estates' wrongful death actions in state court where Wilkes could seek multimillion-dollar jury verdicts. If THMI were in bankruptcy, the automatic stay would bring an end to the state court litigation, and the prosecution of the Probate Estates' wrongful death actions would have to move to the Bankruptcy Court in the form of wrongful death claims against THMI's estate, the value of which would be decided

---

[32] Or a federal district court exercising diversity jurisdiction under 28 U.S.C. § 1332.

by the Bankruptcy Court. *See* 11 U.S.C. § 502(a).[33]  Doing so would diminish the value of the claims, and they would likely be worth significantly less than they would be before a jury.

A second possible reason for putting FLTCI, rather than THMI, into bankruptcy could have been the assistance the trustee of the bankruptcy estate could provide Wilkes in its prosecution of the Probate Estates' actions in state court.  The scope of the evidence the trustee would be able to discover in marshalling FLTCI's assets would likely exceed what Wilkes could obtain under state discovery rules.  Access to what the trustee uncovered would aid Wilkes in prosecuting the Probate Estates' claims—and would be helpful to use later in post-judgment proceedings supplementary, such as impleading targets to collect judgments.

In exchange for the freedom to have their wrongful death actions prosecuted to the hilt, the Probate Estates paid a price. They gave up their fraudulent transfer claims against FLTCH and the Targets under Florida's UFTA since those claims became "extinguished" on or before December 10, 2011.  As things turned out,

---

[33] 11 U.S.C. § 502(a) states in relevant part:

> (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects.
>
> (b) . . . [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount.

though, the Trustee and her special litigation counsel uncovered evidence sufficient to enable the FLTCI estate to make out causes of action against FLTCH and aligned Targets under theories of law other than those the UFTA codifies.

⋆          ⋆          ⋆

The Jackson, Nunziata, and Webb Estates filed claims against the Debtor's—FLTCI's—estate on February 22, 2012, in the sums of $110 million, $200 million, and $900 million respectively.[34] The Jones, Townsend, and Sasser Estates filed claims against the Debtor's estate on March 27, 2012, in the sums of $200 million each.[35]  With the exception of the Jackson Estate, none of the Probate Estates had a claim against the Debtor.  All of their claims were based on THMI's (and THI's) negligence.  Nonetheless, Wilkes, as an officer of the court, in filing claims against the Debtor's estate that appeared to be against THMI rather than the Debtor, effectively represented that the claims against the Debtor were *derivative*

---

[34] At the time the Chapter 7 petition was filed, only the Jackson Estate had a final state court judgment.  As of March 6, 2013, however, these three claims were all based on state court judgments.

[35] On March 6, 2013, the cases of these three Probate Estates were pending in state court.  In *Townsend*, THI's counsel had been retained by the THI Receiver after defense counsel (for THI and THMI) had withdrawn per instructions in April 2010.  On October 17, 2012, THI, having acquired new counsel, filed a "Motion to Disqualify" the trial judge on the ground of bias against THI. Defendant Trans Healthcare, Inc.'s Motion to Disqualify and Supporting Memorandum of Law, *Estate of Arlene Townsend v. Briar Hill, Inc.*, No. 53-2009CA-001025, 2012 WL 8139948 (Fla. Cir. Ct. Oct. 17, 2012)

of THMI's liability. At least, according to the Bankruptcy Court, that is how the Trustee interpreted Wilkes's representations. *In re Fundamental Long Term Care, Inc.*, 500 B.R. 147, 149–50 (Bankr. M.D. Fla. 2013). If FLTCI's liability was in fact derivative of THMI's liability, Wilkes's continued litigation of the Probate Estates' cases filed in state court pre-petition would appear to violate the automatic stay because the litigation had the effect of increasing the Debtor's liability post-petition.

But Wilkes's litigation strategy throughout had been, and continued to be, that the Debtor—FLTCI—and THMI were separate entities: a parent corporation and an independent subsidiary. Accordingly, the Probate Estates' claims against the Debtor's estate, if legitimate, must have been based on a theory other than THMI's conduct, because if the claims were based on a theory that rendered the Debtor legally responsible for THMI's conduct prior to December 5, 2011, Wilkes's continued litigation of the Probate Estates' wrongful death actions against THMI or its post-judgment proceedings supplementary as a creditor of THMI would be barred by the automatic stay in FLTCI's bankruptcy.

In sum, each Probate Estate had a legitimate claim against two entities. First, each Estate had a claim against the Debtor's estate that existed pre-petition against FLTCI. If allowed, the Bankruptcy Court would "determine the amount" of such a claim. 11 U.S.C. § 502(b). Each Estate also had a claim against THMI. The two claims could not both be based on the theory pursued in the

state court wrongful death actions without violating the automatic stay.

⋆          ⋆          ⋆

*Commentary*

As it turned out, the Bankruptcy Court eventually treated THMI as part of the Debtor's estate and the Probate Estates as having filed claims against THMI's (nonexistent) estate. The Bankruptcy Court also impliedly afforded the Probate Estates standing, as THMI creditors, to join the Trustee (now in effect acting as trustee of *two* bankruptcy estates—FLTCI's and THMI's) in prosecuting the surviving claims of the Second Amended Complaint in the adversary proceeding initiated by Wilkes on October 1, 2013. *See infra* part III. The claims were in two groups. One group consisted of the Trustee's strong-arm claims against FLTCH and several Targets as fraudulent transferees of THMI's assets under the Florida UFTA. The other group consisted of the Trustee's claims against the same defendants as the perpetrators of a variety of torts and breaches of duty committed against THMI and as the successors in interest of THMI.

⋆          ⋆          ⋆

On April 2, 2012, after the Probate Estates' claims against the Debtor's estate had been filed, Berger Singerman LLP ("Singerman") appeared in the case as the Debtor's counsel and moved the Bankruptcy Court to convert the Debtor's Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code. The motion, which stated that FLTCI and THMI had ceased operations six years ago,

represented—among other things—that the $110 million judgment the Jackson Estate obtained against FLTCI in *Jackson* was invalid because FLTCI never appeared in the case and thus was not within the state trial court's jurisdiction. Consequently, the Jackson Estate was not a valid judgment creditor of FLTCI, and its filing of the Chapter 7 petition was effectively a nullity. Assuming the petition's validity, the motion stated that the "Trustee's strategy and actions [we]re being orchestrated by Wilkes, for the sole benefit of its clients and the firm itself through the ultimate recovery of astronomical contingency fees" and that Wilkes was "using the Bankruptcy Case and . . . the powers of the Chapter 7 Trustee to deny THMI representation" in the cases Wilkes had brought against it.[36]

On April 3 and 4, after receiving Singerman's motion to convert, the Trustee, armed to a great extent with the information Wilkes provided her, filed motions for leave to conduct Rule 2004 examinations of some of the individuals Wilkes had impleaded in *Jackson* pursuant to Fla. Stat. § 56.29—including attorneys at Troutman Sanders, LLP ("Troutman"), the law firm that created the legal

---

[36] If the Bankruptcy Court granted Singerman's motion, FLTCI would function as a debtor-in-possession with the rights and powers of a Chapter 11 trustee. In that capacity, FLTCI itself would be required to perform all except the investigative functions and duties of a bankruptcy trustee. *See* 11 U.S.C. § 1107. These duties would include accounting for property, examining and objecting to claims, and filing informational reports as required by the court. *Id*. § 704. In that capacity, FLTCI would play a large part in determining who would be examined under Rule 2004—and to what extent.

21-10587               Opinion of the Court                    27

structure for the bust-out scheme, and other individuals presumably having knowledge of the disposition of THMI's assets.[37]

Singerman immediately objected to the Trustee's motions. Picking up where it left off in its motion to convert, Singerman had this to say about Wilkes's involvement in the Trustee's decision-making:

> 14.  Based on the nature and scope of the 2004 Motions, it is abundantly clear that the Trustee continues to advance a litigation strategy hoisted on her by [Wilkes] on behalf of the Petitioning Creditor and Claimants in this case *to deprive the Debtor [FLTCI] and [THMI] of legal representation and available defenses*.  At the same time, the Trustee is improperly using . . . the

---

[37] Rule 2004 states in subsection (b) in relevant part:

> The examination of an entity under this rule or of the debtor under § 343 of the [Bankruptcy] Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge.'

Fed. R. Bankr. P. 2004(b).  In subsection (c), Rule 2004 states in relevant part:

> The attendance of an entity for examination and for the production of documents or electronically stored information, whether the examination is to be conducted within or without the district in which the case is pending, may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial.

Fed. R. Bankr. P. 2004(c).

> 2004 Motions to engage in broad, "fishing expedition" discovery that the Wilkes plaintiffs have been unable to obtain in any other forum.
>
> 15.  Tellingly, the 2004 Motions each request that the [Bankruptcy] Court order that "interested creditors" be permitted to attend the examinations and "make inquiry."  There is no doubt that the intent of that request is to give Wilkes a broad discovery platform to pursue non-debtor targets in non-bankruptcy forums. The request certainly has nothing to do with the preparation of the Debtor's Schedules or Statements of Financial Affairs.
>
> . . .
>
> 18.  Based on the foregoing, the Debtor respectfully submits that the [Bankruptcy] Court should deny the 2004 Motions, without prejudice, or, alternatively, not adjudicate the 2004 Motions pending a ruling on the Motion to Convert.

Debtor's Objections to Motions of Chapter 7 Trustee for Rule 2004 Examinations at 4–5, *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. Apr. 5, 2012) (emphasis added) (footnote omitted).

The Bankruptcy Court heard the Trustee's Rule 2004 motions on April 12, granted the motions with respect to the production of certain documents, and stated that it would consider the Debtor's objections to the motions on June 6.  On April 24, the Bankruptcy Court denied the Debtor's motion to convert the case to a Chapter 11 proceeding.

21-10587                    Opinion of the Court                    29

★          ★          ★

*Commentary*

In sum, the Trustee, soon after her appointment, knew that Wilkes: (1) was unable to execute the *Jackson* judgment against the defendants in state trial court; (2) realized that THMI's assets had been fraudulently transferred to FLTCH and the Targets; and (3) should have been aware of Florida's UFTA and its four-year prescriptive period. That period began to run at the time of the bust-out scheme in March 2006. It therefore ran out by the time the Jackson Estate received a state court judgment on July 22, 2012. But under the Florida UFTA discovery extension, Fla. Stat. § 726.110, the Jackson Estate had one year from Wilkes's discovery of the fraud, which occurred on or before December 10, 2012, to bring a fraudulent transfer action under Florida's UFTA.

Still attempting to collect on the *Jackson* judgment, Wilkes tried to come to a solution. It first tried to bring a Florida UFTA action via a § 56.29 motion to implead but was unable to obtain relief. Wilkes then tried a second option: petitioning for Chapter 7 relief against FLTCI. Wilkes waited to file for this relief until December 5, 2011—five days before the absolute latest the § 726.110 discovery extension would have run for the Probate Estates' UFTA claims against FLTCH and the Targets. But Wilkes did not place THMI in Chapter 7 bankruptcy—it petitioned the Bankruptcy Court to put **FLTCI** into Chapter 7 bankruptcy. Wilkes therefore allowed the one-year discovery extension to expire, thus extinguishing the Probate Estates' claims for fraudulent transfer against

THMI.  As it turned out, the Trustee later discovered evidence that enabled the Probate Estates to sue FLTCH and the Targets as successors to THMI, holding them responsible for THMI's debts, including the Probate Estates' judgments.

Beyond the statute of repose issue, there was a further issue with Wilkes's plan.  FLTCI had no assets except THMI shares.  FLTCI's Trustee therefore could not pursue FLTCH and the Trustees under the UFTA because FLTCI was not itself guilty as a fraudulent transferor.  So Wilkes's strategy was two-fold: (1) have the Chapter 7 Trustee in possession of the THMI shares seek evidence of THMI causes of action against FLTCH and the Targets even though such causes of action are not actually property of the estate, thus using the Trustee as a discovery platform; and (2) allow the Trustee to obtain evidence Wilkes could use in § 56.29 proceedings to implead the Targets and other potential fraudulent transferees in state court.

## II.

### A.

On June 1, 2012, the Trustee moved the Bankruptcy Court to approve the employment of Steven M. Berman, a partner at Shumaker, as special litigation counsel.  The Bankruptcy Court granted the motion on June 5.  The same day, Singerman (the Debtor's counsel) moved the Bankruptcy Court to dismiss the Chapter 7 case on several grounds, including that Wilkes was abusing the Chapter 7 process in seeking relief against a debtor it knew "ha[d] no business activity, no going concern value, and no employees."

21-10587                Opinion of the Court                31

According to Singerman, Wilkes filed the petition "to further its financial interests in maximizing claims, and facilitating execution of default judgments, against the Debtor, THMI and other third parties regardless of the resulting prejudice to the estate."

Along with the motion to dismiss, Singerman filed two other pleadings that complained that the Trustee, in assisting Wilkes's prosecution of claims against THMI, was breaching her duty to maximize the Debtor's estate by enhancing the value of THMI's shares—which were assets of the Debtor's estate. The first pleading supplemented the Debtor's objections to the Trustee's motions for Rule 2004 examinations discussed above. The second pleading responded to the Trustee's motion for a protective order regarding the notice of deposition the Debtor served on the Trustee on May 23.

The gist of the two filings was essentially two-fold. First, the $110 million judgment the *Jackson* court entered against FLTCI in the proceeding supplementary was invalid because that court lacked personal jurisdiction over FLTCI; therefore, the Jackson Estate lacked a valid judgment on which to base its Chapter 7 petition against FLTCI. Second, and as argued in Singerman's motion to dismiss, the Trustee was breaching her duty to the Debtor's estate in "acquiesce[ing] to Wilkes in connection with its unrelenting efforts to (mis)use this Chapter 7 case to further its financial interests in maximizing claims, and facilitating execution of default judgments, against the Debtor, THMI and other third parties regardless of the resulting prejudice to the estate."

⋆          ⋆          ⋆

*Commentary*

Singerman's argument proceeds from two points. The first is that THMI was part of the Debtor's estate because THMI's shares were FLTCI's sole asset. The Trustee was attempting to maximize the value of THMI's shares, and thus the value of the Debtor's estate, so that the Jackson Estate's claim (based on its $110 million judgment against FLTCI) could be paid. The second point is contradictory. Instead of maximizing the value of THMI's shares to the Debtor's estate, the Trustee, in acquiescing to Wilkes's pursuit of judgments against THMI, was *minimizing* the value of the shares to the Debtor's estate.[38]

⋆          ⋆          ⋆

Berman, on behalf of the Trustee, opposed the motion to dismiss in a response filed on June 18.[39] The Trustee lamented that in her investigation into the assets of the Debtor's estate, "the Debtor and related parties have uniformly and defiantly refused to produce [requested] documentation without broad confidentiality

[38] The automatic stay issued in the FLTCI bankruptcy barred Wilkes from prosecuting any pre-petition claims against FLTCI in state court, or from otherwise increasing the liability of its bankruptcy estate. At the same time, Wilkes was not barred from prosecuting claims against THMI, which, if they resulted in judgments against THMI, would minimize the value of its shares as assets of the Debtor's estate.

[39] Unless otherwise indicated, all of the Trustee's pleadings were filed Shumaker.

agreements, all in derogation of th[e] [Bankruptcy] Court's directives and unquestionably clear statutory law." Further, the Trustee noted that she "received no substantive responses to her information requests"—nothing but "rigorous opposition to avoid any flow of even the most basic information" required.

In addition to the Trustee, the Probate Estates also opposed the Debtor's motion to dismiss on several grounds. Among the reasons was that the Debtor had no standing to file the motion, "particularly over the opposition of the Creditors"[40]—namely, the Probate Estates. Wilkes stated that "[t]wo of the Creditors, the Estate of Elvira Nunziata and the Estate of Joseph Webb, have unstayed judgments against THMI. The remaining creditors, with the exception of the Estate of Jones,[] have default judgments as to liability against THMI."[41]

Responding to the Probate Estates' opposition to dismissal, the Debtor stated:

> [T]his case gives [the Probate Estates] no substantive right they do not already have. Their only aim in filing this case was to shop for a better forum for broader discovery that they cannot get in their chosen

---

[40] Wilkes appended this footnote to that statement: "[T]he Order for Relief is conclusive as to the Debtor that the claim of the Petitioning Creditor, the Estate of Juanita Jackson, is an undisputed, non-contingent claim that is owed by the Debtor."

[41] The unstayed judgments that the Nunziata and Webb Estates obtained were the result of empty-chair trials in state court.

non-bankruptcy courts, which courts will, in any event, be the ultimate arbiters of the parties' rights and defenses. This Court and its jurisdiction are being used as a pawn to gain information and for other strategic litigation purposes, not for *any* legitimate bankruptcy purpose.

Debtor's Omnibus Reply to State Court Litigants' and Trustee's Oppositions to Debtor's Motion to Dismiss Chapter 7 Case at 9–10, *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. June 21, 2012) (emphasis in original). Following an evidentiary hearing, the Bankruptcy Court denied the motion without prejudice on July 6, 2012.

At a hearing on June 29, 2012, the Bankruptcy Court instructed Berman to confer with interested counsel and prepare a draft of an omnibus order establishing discovery procedures and protocol for the production of documents and the examination of witnesses. The Bankruptcy Court considered Berman's draft, and on July 12, 2012, it incorporated parts of Berman's draft into the Omnibus Order it entered. The Omnibus Order established the scope of the Trustee's Rule 2004 examinations and stated that the Trustee should coordinate the date, time, and location of the examinations to allow them to be completed by September 14, 2012. It provided that the examinations and consequent discovery could potentially include other business entities or assets in the Debtor's estate.

On July 19, 2012, the Trustee filed a multi-count complaint for damages in the Circuit Court of Polk County, Florida—where

21-10587            Opinion of the Court            35

the lawsuits brought by the Jackson, Sasser, and Townsend Estates had been filed.[42]  The complaint charged the defendants with: (1) legal malpractice in abandoning the defense of THI and THMI in *Jackson*; (2) legal malpractice in failing to respond on behalf of FLTCI to the *Jackson* court's May 23, 2011, order to show cause, which allowed the state trial court to enter a $110 million default judgment against FLTCI; and (3) breach of fiduciary duties owed to THMI and FLTCI.[43]  On July 20, 2012, the Trustee filed another complaint in the Circuit Court of Polk County, charging the defendants with unauthorized practice of law in unlawfully controlling or directing THMI's defense in *Jackson* and in representing themselves as counsel for FLTCI.[44]  The defendants in both cases timely removed the cases to the United States District Court for the Middle District of Florida.[45]

---

[42] The complaint was filed against: FAS; Kristi Anderson (FAS in-house counsel); Alan Grochal, the THI Receiver; two law firms, Tydings & Rosenberg LLP and Quintairos, Prieto, Wood & Boyer, P.A.; and six lawyers of the respective firms.

[43] The filing of this lawsuit was no doubt prompted by the statements Singerman made in the Debtor's April 2 motion to convert the case to a Chapter 11 proceeding and in the filings made on June 5, both referring to the entry of the $110 million default judgment against FLTCI.

[44] The defendants in this complaint were FAS, Anderson, and Christine Zack (FAS's in-house counsel).

[45] The cases were removed to the District Court under 28 U.S.C. § 1441 based on diversity of citizenship.

Three weeks later, on August 10, 2012, the Debtor—
FLTCI—moved the Bankruptcy Court for leave to challenge the
*Jackson* court's $110 million judgment against it pursuant to Florida
Rule of Civil Procedure 1.540(b)(4).[46] The Bankruptcy Court heard
the motion on September 7 and denied it without prejudice in a
September 25 order.[47] The Debtor renewed the motion on March
6, 2013.

---

[46] Rule 1.540 states in pertinent part:

> (b) **Mistakes; Inadvertence; Excusable Neglect; Newly Dis-
> covered Evidence; Fraud; etc.** On motion and upon such
> terms as are just, the court may relieve a party or a party's legal
> representative from a final judgment, decree, order, or pro-
> ceeding for the following reasons:
>
> . . .
>
> (4) that the judgment, decree or order is void.

Fla. R. Civ. P. 1.540.

[47] The dispositive portion of the order reads:

> The Debtor's Motion is DENIED without prejudice condi-
> tioned on the Trustee (i) following through on obtaining an
> extension of the deadline for filing a motion under Florida Rule
> of Civil Procedure 1.540 in the action pending in Polk County
> Circuit Court, styled *Estate of Juanita Amelia Jackson v. Briar Hill,
> Inc., et al.*, Case No. 2004-CA-3229; and (ii) meeting and con-
> ferring in person with the [THI] Receiver, Alan Grochal.

Order Denying Debtor's Motion for Leave to Challenge Judgments
and Claims at 1, *In re Fundamental Long Term Care, Inc.*, No. 8:11-BK-
22258 (Bankr. M.D. Fla. Sept. 7, 2012).

The Omnibus Order temporarily resolved the disputes resulting from the Trustee's efforts to conduct Rule 2004 examinations of several Targets.  The Omnibus Order gave the Trustee the right to conduct discovery regarding: (i) the Debtor's assets and liabilities; (ii) control of the Debtor's assets and operations; (iii) potential avoidance actions; and (iv) the possibility of including other business entities or assets in the Debtor's bankruptcy estate.  The Trustee's mission, as she saw it, was to identify, secure, and recover hundreds of millions of dollars (if not more than one billion dollars) as the owner of THMI assets in the form of tort claims—including claims for legal malpractice,[48] breach of fiduciary duties, and fraud.  According to the Bankruptcy Court, the Trustee's mission was "really no secret to anyone involved in this case. . . . [T]he Trustee . . . openly stated what her goal [wa]s." *In re Fundamental Long Term Care, Inc.*, 500 B.R. 147, 151 (Bankr. M.D. Fla. 2013).

★          ★          ★

*Commentary*

The property of the Debtor's bankruptcy estate included "all legal or equitable interests of the debtor in property," 11 U.S.C. § 541(a)(1), such as causes of action belonging to the debtor.  5 Collier on Bankruptcy ¶ 541.07 (16th ed. 2022).  The Debtor's estate did not extend, however, to THMI's assets, including THMI's causes of action.  *See Kreisler v Goldberg*, 478 F.3d 209, 214 (4th Cir.

---

[48] The multi-count lawsuits the Trustee filed in the Circuit Court of Polk County in July 2012 were part of the Trustee's mission.

2007) ("The fact that a parent corporation has an ownership interest in a subsidiary, however, does not give the parent any direct interest in the *assets* of the subsidiary.") (emphasis in original); *In re Com. Mortg. & Fin. Co.*, 414 B.R. 389, 395 (Bankr. N.D. Ill. 2009) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary, but not the assets of the subsidiary."). As the owner of 100% of THMI's stock, though, the Trustee had full control of THMI. In seizing THMI's tort claims, which were the only assets THMI possessed, the Trustee treated THMI as if it were dissolved and its tort claims had become part of the Debtor's estate. After the Bankruptcy Court consolidated FLTCI and THMI at the trial of the principal adversary proceeding in this case, THMI's assets were part of the bankruptcy estate.

### B.

The Rule 2004 examinations, coupled with information provided by Wilkes and what Berman learned about the bust-out scheme, led the Trustee to file claims she believed aided her mission. Before turning to the claims themselves, we explain the bust-out scheme.[49]

### 1.

THI was incorporated under Delaware law in 1998. Through subsidiaries, it operated nursing homes, assisted living

---

[49] The description of the bust-out scheme draws on Chief Judge Williamson's summary from the Bankruptcy Court's opinion in *In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 365–71 (Bankr. M.D. Fla. 2014).

facilities, and long-term acute care hospitals across the United States.  THMI provided a wide variety of administrative services to THI's operating subsidiaries.

A private equity group referred to as the "GTCR Group" provided THI's initial funding.[50]  Between 1998 and 2005, the GTCR Group invested $37 million of its own capital in THI.  Ventas, Inc. ("Ventas") loaned THI $55 million followed by another $22 million, with the stock of THI and THMI serving as collateral.  GECC eventually assumed the $55 million loan.  The GTCR Group controlled THI's Board of Directors and was instrumental in the company's day-to-day management and administration.

Early in 2003, the GTCR Group decided to increase THI's nursing home operations.  Integrated Health Services ("Integrated"), one of the nation's largest nursing home operators, was in bankruptcy in Delaware, and the GTCR Group planned on acquiring its assets out of bankruptcy.  To do that, the GTCR Group restructured THI.  First, it created THI Holdings, LLC ("THI Holdings"), exchanging the GTCR Group's 83% stock interest in THI for an equal percentage of THI Holdings's shares.  Second, THI Holdings created two new subsidiaries: THI of Baltimore, Inc. ("THI-Baltimore") and THI of Baltimore Management, LLC ("THMI-Baltimore").  With the restructuring in place: (1) THI Holdings became the parent of two wholly owned subsidiaries,

---

[50] The GTCR Group consisted of GTCR VI Executive Fund; GTCR Fund VI, LP; GTCR Associates VI; GTCR Partners VI, LP; and GTCR Golder Rauner, LLC.

THI and THI-Baltimore; (2) THI became the parent of the wholly owned subsidiary THMI; and (3) THI-Baltimore became the parent of the wholly owned subsidiary THMI-Baltimore.

With this restructuring, the GTCR Group intended to replicate the old THI structure for holding the Integrated assets it planned on acquiring. THI-Baltimore, operating as THI had, would operate the acquired nursing homes, and THMI-Baltimore, functioning as THMI had, would provide the management services for the homes.

But the GTCR Group failed to acquire the Integrated nursing homes. It was outbid by ABE Briarwood ("Briarwood"). THI-Baltimore was not out of the picture for long, however. It was soon able to strike a deal with Briarwood because Briarwood was not a licensed nursing home operator. Briarwood leased or subleased the former Integrated homes to THI-Baltimore to operate. THI-Baltimore then contracted with THMI-Baltimore to provide the management services for the homes. THI-Baltimore would be profitable, the GTCR Group thought, because the income generated by its nursing home operations would more than offset the rent it paid Briarwood and the management fees paid to THMI-Baltimore.[51]

---

[51] THMI-Baltimore lacked a staff, so it used THMI's employees and equipment (and other assets) to provide management services to the newly acquired Integrated nursing homes. THMI therefore shared in the revenue THMI-Baltimore received from THI-Baltimore for providing the services.

The arrangement with Briarwood coupled with THI's operations seemed successful.  By mid-2003, THI was reporting gross annual revenues of $1 billion and a net annual income of $6 million.  In reality, however, THI had sustained a $29 million loss and was on the verge of defaulting on the Ventas and GECC loans.  GECC and Ventas therefore took steps to protect their positions.

First, GECC and Ventas forced THI to enter into a series of forbearance agreements at a substantial cost in fees to THI.  Second, GECC took control of THI's bank accounts.  Pursuant to the terms of the loan agreement between GECC and THI, THI's cash flowed through a series of lockboxes and sweep accounts.  After GECC learned of misrepresentations in THI's financial reporting, GECC began "trapping cash" in the sweep accounts.  It instructed the Bank of New York, which kept THI's deposits, to capture all of the money held in THI's accounts.  THI gave GECC control of a large portion of its assets.  At the same time, it deprived itself of the ability to pay its bills and jeopardized patient care in its nursing homes.  A lawsuit brought against the GTCR Group, Edgar Jannotta (associated with the GTCR Group), and THI alleged that they were conspiring to divert money loaned to certain nursing home facilities to pay the obligations of other facilities.

By early 2006, THI and THMI were defendants in over 150 lawsuits—among them, the wrongful death actions Wilkes had brought on behalf of the Jackson Estate in 2004 and the Nunziata Estate in 2005.

As the *Jackson* litigation was progressing and other cases like it were about to be filed, THI and THMI's boards of directors considered whether seeking protection in bankruptcy would be in the best interests of the companies, their employees, and their creditors. In January 2005, they authorized the companies to file for bankruptcy. The GTCR Group overruled their decision. After consulting counsel at Troutman,[52] the GTCR Group decided to take a different approach and execute a bust-out scheme to preserve the THI conglomerate and keep its assets intact.

2.

The bust-out scheme was carried out in three phases. The initial phase involved closing two transactions simultaneously in March 2006. In the first transaction, THI Holdings sold THMI's assets, as well as its shares of THI-Baltimore, to FLTCH for $9.9 million—far less than their fair market value. As of January 2006, those assets had been valued at more than $183 million.

In the second transaction, THI sold its shares of the now-assetless THMI[53] to FLTCI for $100,000. FLTCI therefore acquired all of THMI's liabilities but none of its assets. Troutman—where Leonard Grunstein, who held an interest in FLTCH,[54] was a partner—had incorporated FLTCI just months before. FLTCI's sole

---

[52] On July 1, 2020, Troutman Sanders merged with Pepper Hamilton to become Troutman Pepper Hamilton Sanders LLP.

[53] THI owned 100% of THMI's issued and outstanding shares of stock.

[54] Murray Forman, an investment banker, also held an interest in FLTCH.

shareholder was Barry Saacks, an elderly graphic artist who was not aware that he owned FLTCI or that it acquired stock in THMI.

After acquiring the THMI assets, FLTCH rebranded them and continued generating millions in profits without the burden of THMI's liabilities. Within six months, THMI-Baltimore changed its name to Fundamental Clinical Consulting, LLC ("FCC") and took over the operations of the former Integrated nursing homes, and Fundamental Administrative Services, LLC ("FAS")[55] was created to take over the administrative services under the management contracts previously held by THMI-Baltimore. All of THMI's employees became employees of either FCC or FAS, depending on whether the employee provided operational aid, clinical support, or administrative services.

THMI and FLTCI became defunct following the March 2006 closings, but THI remained an active corporation until the GTCR Group launched the second phase of the bust-out scheme, winding down THI.

The GTCR Group launched the second phase in November 2007 when it sold a THI entity for $4.7 million. Three months later, the GTCR Group sold the remaining THI properties (except for one facility in Maryland) to Omega Healthcare Investors, Inc. and CommuniCare Health Services. As part of the latter transaction, CommuniCare acquired THI's right to operate those properties.

---

[55] FLTCH was FAS's sole member.

The GTCR Group received nearly $48 million from the sale. The proceeds of the sales were used to pay off THI's creditors.

In January 2009, the GTCR Group had THI petition a Maryland state court on behalf of itself and 143 subsidiaries—but not THMI—for appointment of a receiver. The Maryland court granted THI's petition and the same day appointed a receiver, who was subsequently replaced by Alan Grochal, an attorney in the law firm that filed the petition. The purpose of the receivership was to obtain a stay in the litigation of Wilkes's cases while the receivership was ongoing.

With the receivership underway, the GTCR Group executed the third—and final—phase of the bust-out scheme: concealing the March 2006 transactions. The transactions had to be concealed long enough for the statute of limitations to run on a fraudulent transfer suit against FLTCH.[56] The prescriptive period for an action to void a fraudulent transfer was four years in Florida and Delaware and six years in New York. Prior to the trial of the adversary proceeding in this case in October 2014, the parties—with the

---

[56] The lawyers counseling the GTCR Group apparently assumed that Wilkes would not pursue FLTCH until Wilkes had obtained a judgment in the earliest of the Probate Estate cases it had brought, *Jackson*, and that with the judgment in hand, Wilkes would file an UFTA action against FLTCH and any of the recipients of THMI's assets. As it turned out, those lawyers were correct—Wilkes did not pursue FLTCH with an UFTA claim until after it filed an adversary complaint against FLTCH and others in the FLTCI bankruptcy case on October 1, 2013.

Bankruptcy Court's consent—agreed to apply the Florida UFTA, Fla. Stat. § 726.101 *et seq*.

In an effort to ensure that the prescriptive period would run before Wilkes established that its clients' negligence claims were meritorious and thus could support a free standing UFTA cause of action, the GTCR Group had to take control of THI and THMI's defense in those cases in order to delay their completion. The receivership order had given the receiver the right to defend THMI in Wilkes's cases even though THMI was not one of the THI subsidiaries included in the THI receivership. In June 2009, as a delay tactic, Grochal (the THI Receiver) filed an action, *Trans Health Care, Inc. v. Creekmore*, in the Circuit Court of Miami-Dade County for the domestication of the receivership in Florida.[57] No. 2009CA-11513, 2013 WL 11015914 (Fla. Cir. Ct. June 19, 2013). Grochal immediately sought a stay of the actions Wilkes was prosecuting against THI and THMI. The circuit court granted the domestication of the receivership but denied Grochal's application for a stay, leaving the decision whether to grant a stay to the state courts in which Wilkes's cases were pending.

To reiterate, the four-year prescriptive period for filing an action to void the March 2006 sale of THMI's assets to FLTCH and any other recipients of the assets would expire in March 2010. Grochal, aware of that fact and the status of Wilkes's cases, directed

---

[57] Creekmore was a Wilkes client. None of Wilkes's cases were pending in Miami-Dade County.

46                    Opinion of the Court                    21-10587

the lawyers that the receivership had retained to defend THI and THMI in Wilkes's cases to withdraw their representation in April 2010—just over four years after the March 2006 transactions had closed and 16 months after the receivership's creation.

The lawyers defending THI and THMI in *Jackson* withdrew their representation of the defendants with leave of court on May 18, 2010. The case went to trial before a jury on July 22, 2010, without the lawyers' presence. It was thus an empty-chair trial and resulted in verdicts of $55 million each against THI and THMI. Judgments were entered accordingly.

★          ★          ★

*Commentary*

In a nutshell, the bust-out scheme involved THMI's assets and liabilities being split into two separate entities. FLTCH got the assets. FLTCI got the liabilities. If they could get away with it, THI's owners could enjoy THMI's money without being subject to THMI's legal liabilities. It goes without saying that this is wrong. That is why fraudulent transfer statutes exist. The bust-out scheme continued by attempting to avoid liability under those statutes. Namely, the powers that be in the THI corporate family orchestrated a defense strategy that allowed the UFTA prescriptive period to run without alerting potential creditors like Wilkes's clients that something untoward was going on behind the scenes.

21-10587          Opinion of the Court          47

3.

In a way, the bust-out scheme continued through the bankruptcy proceedings in the Trustee's conflict with the Debtor—FLTCI—FLTCH, and the Targets over the representation of THI and THMI in Wilkes's state court proceedings. After Wilkes put FLTCI into bankruptcy in December 2011, the Targets realized that the withdrawal of defense counsel in Wilkes's wrongful death actions was unwise. Although they appeared to have solid time bar defenses to Wilkes's fraudulent transfer actions in the form of post-judgment motions under Fla. Stat. § 56.29, Wilkes's litigation strategy was of considerable concern. After obtaining multimillion-dollar verdicts in empty-chair jury trials, Wilkes would use the evidence the bankruptcy trustee uncovered to reinforce its § 56.29 motions or support an adversary proceeding in the FLTCI bankruptcy. To bring the empty-chair trials to an end and reduce their § 56.29 exposure, the Targets concluded that they had to provide defense counsel for THI and THMI in Wilkes's cases. In a memorandum opinion issued on March 20, 2015, the Bankruptcy Court recalled the steps they took:

> [T]he targets decided to provide a defense for THI and THMI as an outer firewall to any liability to the Probate Estates. In an effort to ensure the remaining cases did not go undefended, the targets entered into a settlement agreement with the THI Receiver [Grochal] on January 5, 2012.
>
> Under the January 2012 agreement, FAS—one of the targets—agreed to defend THI, the THI Receiver, and

> the THI receivership estate from any claims arising
> out of the negligence or wrongful death cases filed by
> the Probate Estates.  FAS agreed to deposit $800,000
> in escrow to fund the costs of that defense.  GECC—
> one of THI's lenders who was also a target—likewise
> agreed to contribute up to $200,000 toward the de-
> fense costs.  FAS fairly immediately delegated the
> duty to defend THI back to the THI Receiver, and the
> THI Receiver immediately set out to retain counsel
> for THI and THMI.

*In re Fundamental Long Term Care, Inc.*, 527 B.R. 497, 504 (Bankr. M.D. Fla. 2015).

As the Bankruptcy Court pointed out, however, the Receiver didn't act soon enough:

> Newly retained counsel for THMI attempted to ap-
> pear on the company's behalf on the morning of trial
> in the case filed by the Nunziata Estate.  But the court
> in that case would not let counsel appear.  Likewise,
> the court in the case filed by the Webb Estate would
> not let newly retained counsel appear for either THI
> or THMI.  Because the state courts would not let
> newly retained counsel appear on behalf of THI and
> THMI, both of those cases proceeded to empty-chair
> trials, and the juries ultimately returned more than $1
> billion in verdicts combined.

21-10587                Opinion of the Court                49

*Id.* (footnote omitted).[58] By the time Berman and Shumaker joined the Trustee's team, lawyers retained by the THI Receiver—Grochal—were actively representing THI and THMI in Wilkes's wrongful death cases. At the same time, the Trustee was seeking access to their litigation files. The THI Receiver objected, so Berman moved the Bankruptcy Court for an order requiring the Receiver to show cause why the files should not be produced. The

---

[58] The verdict against THMI in *Nunziata*, which was tried on January 9, 2012, was $60 million in compensatory damages and $140 million in punitive damages. Almost immediately after the entry of judgment, Wilkes moved the court *ex parte* for an injunction against FLTCH, FAS, Forman, Grunstein (all Targets), the THI Receiver, and his attorney—none being parties in the case— that "purport[ed] to prohibit the [THI] Receiver and his 'agents and assignees' from challenging in any court anywhere in the country any aspect of the [Nunziata] Estate's entitlement to collect on its judgment." *Trans Health Mgmt., Inc. v. Nunziata*, 159 So. 3d 850, 856–57 (Fla. 2d Dist. Ct. App. 2014). The state court granted the injunction. THMI, represented by Shumaker, appealed the judgment, and the enjoined parties appealed the injunction. The Second District Court of Appeal dismissed THMI's appeal under Fla. Stat. § 607.1622(8) because THMI had been dissolved for failure to file an annual report. *Id.* at 855. The Second District Court of Appeal also vacated the injunction because it "was issued without notice to any of the nonparties, without the issuance of process on any of them, and without the presentation of admissible evidence." *Id.* at 858. In a consolidated appeal, FAS challenged a pretrial discovery order finding that it "had committed a fraud on the court." *Id.* at 854. The Second District Court of Appeal quashed the order because it "was not based on evidence admitted at a properly noticed evidentiary hearing." *Id.* at 859–60.

The judgment in *Webb* was reversed and the case was remanded for further proceedings. *Trans Health Mgmt., Inc. v. Webb ex rel. Webb*, 132 So. 3d 1152 (Fla. 1st Dist. Ct. App. 2013) (per curiam).

Receiver did not dispute that the Trustee should generally have access to THMI's books and records, but he claimed that the lawyers' litigation files were privileged. *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258, 2012 WL 4815321, at *2 (Bankr. M.D. Fla. Oct. 9, 2012) (internal quotation marks omitted). He also took the position that he had the exclusive right to control the defense of any claims against THMI. *Id.* This was so, he said, because he had assumed the obligation of defending THMI "to ensure that no THMI obligation might by default exhaust the limited assets of the THI estate to the detriment of THI's other creditors." *Id.* (internal quotation marks omitted).

The Bankruptcy Court held a hearing on the Receiver's objection on September 27, 2012, and on October 9, 2012, the Bankruptcy Court issued an order stating that

> the Trustee—as the sole shareholder of the Debtor's wholly owned subsidiary—should have (i) access to the books and records relating to the Debtor and its subsidiary (including any litigation files); and (ii) the right to control THMI activities (including the right to assert any attorney-client privilege, to the extent it exists, on THMI's behalf).

*Id.* at *11.

On October 29, 2012, the THI Receiver appealed that order and promptly moved the Bankruptcy Court to stay its order pending the appeal. Wilkes opposed the motion, alleging that FLTCI was merely "a shell and its purchase of THMI was a sham transaction designed to benefit a few wrongdoers by transferring the

valuable assets of THMI, lodging the liabilities in a shell company, and concealing the whole scheme from the creditors." Wilkes went on to allege that the Receiver was an integral part of the scheme:

> In January 2012, sixteen parties including General Electric Capital Corporation, Inc., GTCR, Ventas, Rubin Schron, Leonard Grunstein, Murray Forman, and the state court receiver for THI, entered into a specific agreement, memorializing an extant conspiracy, to fund a massive effort to conceal discovery of the facts related to their fraud. The signatories attempted to gain legitimacy for these efforts by using the color of the state law receivership of THI.

Creditors' Opposition to Motion of Alan M. Grochal for Stay Pending Appeal at 3–4, *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. Nov. 5, 2012). Wilkes concluded by saying that "the Debtor and the other 'interested parties' have no standing in this case."

The Bankruptcy Court heard the motion on November 16, 2012, and took it under advisement. The day before, unbeknownst to the Trustee and the Bankruptcy Court, FLTCH and FAS sued THMI in the Southern District of New York for a declaration that the fraudulent transfer claims Wilkes was attempting to prosecute via its § 56.29 post-judgment motions in *Nunziata* and *Webb*—which had resulted in jury verdicts and judgments of $200 million and

$900 million, respectively—were time-barred.[59] *Fundamental Long Term Care Holdings, LLC. v. Trans Health Mgmt., Inc.*, No. 1:12-cv-8339 (S.D.N.Y. filed Nov. 15, 2012). Six days later, the lawyer who brought that action also filed a complaint for Christine Zack (a FAS in-house counsel) against Shumaker in the Southern District of Ohio, seeking unrelated relief. *Zack v. Shumaker, Loop & Kendrick, LLP*, No. 2:12-cv-1075 (S.D. Ohio filed Nov. 21, 2012).

Before the defendants were served with process in those cases, the Trustee decided to take over THMI's defenses in the Wilkes cases. On December 10 and 21, 2012, Shumaker moved the appellate courts in *Webb* and *Nunziata*, where THMI's appeals were pending, to appear as appellants' counsel in place of the lawyers the THI Receiver had retained. Then, on December 27, 2012, the Trustee, having notice of the federal district court cases in New York and Ohio, sought to enjoin their prosecution by commencing an adversary proceeding against FLTCH, FAS, and Zack with a two-count complaint.[60]

---

[59] The complaint alleged that the post-judgment motions were time-barred under the laws of Delaware, Florida, Maryland, New York, and Pennsylvania.

[60] Count I was lodged against Zack and Count II was against FLTCH and FAS. The complaint alleged that following the entry of the Omnibus Order on July 12, the Respondents

> in concert with the Debtor and other interested parties, ha[d] undertaken a concerted effort to undermine the Trustee's administration of this case with the sole purpose of reducing the potential exposure of third parties, including FLTCH and FAS, who were clearly involved in the fraudulent efforts to place the

21-10587                Opinion of the Court                53

On January 4, 2013, the Bankruptcy Court entered an order denying the THI Receiver's motion to stay the Bankruptcy Court's October 9, 2012, ruling pending the THI Receiver's appeal to the District Court for the Middle District of Florida.[61] Although it denied the motion, the Bankruptcy Court ordered counsel for the Trustee, the Receiver's counsel, and counsel hired by the Receiver

---

> Debtor and THMI's [assets], exceeding more than $700 Million in value, beyond the reach of creditors.

Complaint for Temporary and Permanent Injunctive Relief at ¶ 24, *Scharrer v. Zack*, No. 8:12-ap-1198 (Bankr. M.D. Fla. Filed Dec. 27, 2012). The complaint also alleged that "according to an FAS representative's recent 2004 Examination testimony, FAS is paying various sets of lawyers more than $500,000 per month just in connection with the instant bankruptcy case, related litigation, oppositions, and discovery." Id. at ¶ 19. The complaint further alleged that in filing suit against THMI in the Southern District of New York, FLTCH and FAS sought to "avoid consideration and resolution by this Court of the very issues the Trustee is statutorily obligated to investigate [as] authorized by this Court." *Id.* at ¶ 31.

According to the Trustee, Zack's suit against Shumaker alleged that Shumaker's representation of the Trustee "constituted an abuse of process." *Id.* at ¶ 34. The Trustee contended that Zack filed the suit "shortly after th[e Bankruptcy] Court cautioned Zack's counsel against pursuing various requests for sanctions against lawyers and other parties," *id.* at ¶ 33, at a hearing in which the Bankruptcy Court "denied Zack's Motion for Sanctions and suggested that all parties would be well served focusing on the merits of the bankruptcy case and avoiding. . . personal attacks and reflexive assertions of rights to sanctions." *Id.* at ¶ 35.

[61] On December 21, 2012, the Trustee moved the District Court to dismiss the appeal. On September 12, 2013, the District Court entered an order staying the appeal "pending a resolution by the Bankruptcy Court of the interrelationship between THMI and FLTCI."

to represent THMI in the Wilkes cases to confer so the Trustee could "evaluate the positions she will take on behalf of THMI in the Wilkes Litigation." Regarding the current representation of THMI, the Bankruptcy Court provided that:

> The law firms who have made appearances on behalf of THMI are authorized to continue to defend the Wilkes Litigation to prevent prejudice to THMI's rights and to ensure that defaults are not entered or permitted to remain in place uncontested (including prosecuting appeals with respect to previously entered judgments) against THMI until the Trustee either (i) authorizes existing THMI counsel to continue to represent THMI; or (ii) obtains substitute counsel (who enters his or her appearance in each Wilkes Litigation matter) and releases existing THMI counsel from any further obligations.
>
> . . .
>
> In any event, the Trustee shall take any and all actions necessary to ensure that disputed claims are defended, including prosecuting appeals with respect to previously entered judgments.

Order Denying Motion for Stay Pending Appeal at 2, *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. Jan. 4, 2013). The Bankruptcy Court also stated that "[a]ny substantive information regarding the personal injury claims and defenses shared with the Trustee during the . . . conferences will not be shared with the Petitioning Creditors or their counsel absent further order of this Court." *Id.* at 3.

21-10587               Opinion of the Court                    55

The same day this order was entered, FLTCH and FAS moved the Bankruptcy Court to enter an order disqualifying Shumaker as Trustee's counsel on the ground that Shumaker had a conflict of interest in favor of Wilkes.[62] The motion alleged that Wilkes had brought the Chapter 7 case for two reasons:

> The first reason was to remove THMI's defense against the plaintiffs' outrageous claims from competent counsel that serves only THMI's interest, and place it under the control of counsel with loyalties to the plaintiffs and their counsel. The second reason was to obtain a trustee, with the mantle of independence and court appointment, to assist in collecting THMI's bogus liabilities from unrelated third parties. . . . This case and this Court are being used to perpetrate a gross violation of fundamental due process, and [Shumaker's] representation of THMI is critical to pulling it off.

Joint Motion of Fundamental Administrative Services, LLC and Fundamental Long Term Care Holdings, LLC for an Order (A) Disqualifying Shumaker, Loop & Kendrick LLP as Counsel to Trans Health Management, Inc. Due to Conflict of Interest, and (B) Granting Related Relief at 3, *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. Jan. 4, 2011).

---

[62] Contrast this motion with the motion for disqualification and disgorgement Wilkes will later bring, which argues that Shumaker had a conflict of interest *against* Wilkes. *See infra* part IV.

On January 30, 2013, the Bankruptcy Court, "having heard argument of counsel for the Trustee, FAS, and FLTCH," entered an order denying FLTCH and FAS's motion to disqualify Shumaker. The order stated that the Bankruptcy Court would conduct a status conference on February 4, 2013, "at which time the Trustee shall report to the Court the status of pending state court litigation and appeals involving the Debtor or THMI," and the "current representation of the Debtor and THMI in such cases." The Bankruptcy Court required that prior to the status conference, the Trustee and the THI Receiver confer about "the prior and future representation of THMI." On February 5, 2013, FLTCH and FAS appealed that order to the District Court.

Meanwhile, on January 23, 2013, the Bankruptcy Court granted the Trustee's motion for a preliminary injunction barring FLTCH and FAS from prosecuting their declaratory judgment action in the Southern District of New York and barring Zack from proceeding with her case in the Southern District of Ohio.

On March 7, 2013, the Debtor—FLTCI—renewed the motion it had filed on August 10, 2012, pursuant to Florida Rule of Civil Procedure 1.540(b)(4), challenging the $110 million judgment entered against it as void.[63] One day earlier, on March 6, the

---

[63] The same day, the Debtor objected to the Jackson Estate's $110 million claim on the ground that the judgment had been obtained via extrinsic fraud. The Bankruptcy Court overruled the objection on June 21, 2013, following an evidentiary hearing. *In re Fundamental Long Term Care, Inc.*, 500 B.R. 140 (Bankr. M.D. Fla. 2013).

Trustee moved the Bankruptcy Court to authorize and direct mediation of all claims. On March 19, 2013, FLTCH and FAS jointly responded to the Trustee's motion. They repeated their concern from the hearing on their motion seeking Shumaker's disqualification. Their concern was that Shumaker would enter into "collusive settlements of the six [wrongful death] actions with [Wilkes] 'to set THMI's liabilities at amounts that . . . are going to be astronomical windfalls to the plaintiffs . . . set in stone behind closed doors.'" "In the mediation envisioned by the Trustee, there will be no party arguing to the mediator that THMI or the Debtor has zero liability to these plaintiffs." The Bankruptcy Court heard the motion on March 26 and granted it over the objections of the Debtor, FLTCH, and FAS, appointing a retired bankruptcy judge as mediator.[64]

On June 6, 2013, following five days of mediation, the Trustee filed an expedited motion to compromise the claims that the Sasser, Jones, and Townsend Estates had brought against THMI in state court and filed as claims against the Debtor's estate in the bankruptcy proceeding.[65] In *Sasser* and *Jones*, THMI and the

---

[64] As a result of the Bankruptcy Court's September 12, 2013, decision, the mediation ended.

[65] Also on June 6, 2013, the Trustee and Kristi Anderson jointly moved to compromise the claims brought in the lawsuits filed against FAS and Anderson (and others) on July 19 and 20, 2012. FLTCH and FAS objected to the compromise. In a memorandum opinion issued on June 21, 2013, the Bankruptcy Court overruled the objection and approved the compromise. FLTCH and FAS appealed the ruling on June 27, 2013. FAS voluntarily dismissed the appeal on March 11, 2014.

Debtor stipulated to a claim for compensatory damages of $5 million and punitive damages of $5 million—a total of $20 million between the two cases. In *Townsend*, THMI and the Debtor stipulated to a claim for compensatory damages of $10 million and punitive damages of $10 million. The Trustee filed an amendment to her expedited motion to compromise on July 10.

The Trustee's motion was met with vehement opposition by FLTCH, FAS, FCC, THI Holdings, the THI Receiver, GECC, and the Debtor on a variety of substantive and procedural grounds. The objections led to reciprocal exchange of documentary evidence. The Trustee produced documents on which she and Shumaker relied in determining that the settlement proposed was in the best interests of the bankruptcy estate. The objectors produced documents supporting their objections.

The Bankruptcy Court heard the Trustee's motion on July 10–12, 2013, and on July 12 the Bankruptcy Court entered an order approving the compromise. The order was perfunctory. The trial date in *Townsend* was looming and the Bankruptcy Court wanted its ruling to serve as notice well in advance of the trial. The Bankruptcy Court anticipated that the parties would agree on a superseding replacement order. As a precaution, the Debtor, joined by the Receiver, appealed that July 12 order to the District Court, as did FAS and FCC. On December 18, 2013, the District Court reversed the July 12 order and remanded the matter to the Bankruptcy Court with the instruction that it reconsider the settlements after it concluded the adversary proceeding and resolved the issue

of the identity of interest between FLTCI and THMI, if any. The District Court observed that many of the issues plaguing the Bankruptcy Court were "created because the creditors placed [FLTCI] into bankruptcy as the debtor, rather than its subsidiary THMI against which the [Probate Estates] have causes of action." As indicated *infra* part III, the Bankruptcy Court resolved this issue by treating THMI and FLTCI as one entity for Chapter 7 purposes.

On July 30, 2013, FLTCH and FAS moved the Bankruptcy Court for authority either to transfer their New York declaratory action to the Middle District of Florida with referral to the Bankruptcy Court or, in the alternative, to dismiss the New York action without prejudice and refile it in the Bankruptcy Court. On August 2, FLTCH and FAS supplemented their motion to include a request for injunctive relief "based on the flagrant misconduct of the [Townsend] Estate and its counsel, Wilkes," that took place following the jury trial in *Townsend* and entry of judgment for the Townsend Estate on July 29, 2013.

What Wilkes had done in *Townsend* after the entry of judgment was described by the Florida District Court of Appeal in *General Electric Capital Corp. v. Shattuck*, 132 So. 3d 908 (Fla. 2d Dist. Ct. App. 2014). On July 29, 2013—after the state court had entered a default against THI and a jury returned a verdict against THI of

$1.1 billion ($1 billion of which was for punitive damages)—the trial court entered judgment against THI.[66]

> Two days later, the [Townsend E]state filed a "motion to alter and amend the judgment to conform with evidence at trial." The motion asked the court to add the sixteen Appellants to the final judgment pursuant to Florida Rule of Civil Procedure 1.530(g). The motion was served only on the attorney for the THI [R]eceiver, not on any of the sixteen Appellants. Later that same day the trial court, without soliciting responses or holding a hearing, granted the motion and entered the amended final judgment at issue in these proceedings. The amended judgment added the sixteen Appellants as judgment debtors, jointly and severally liable for the damages award "based on the evidence adduced at trial" demonstrating that they were "the real parties in interest."

*Id.* at 910–11.[67]

---

[66] The *Townsend* case was tried after the trial judge denied THI's motion to recuse on the ground of bias. FLTCH and FAS's August 2 supplement to their July 30 motion stated that the "heavily one-sided damages trial was riddled with procedural and substantive errors, and the verdict will be appealed and is very unlikely to withstand appellate review."

[67] The 16 appellants included: FLTCH; FAS; THI-Holdings; THI-Baltimore; GECC; GTCR Golder Rauner, LLC; GTCR Fund VI, L.P.; GTCR Partners VI, L.P.; GTCR VI Executive Fund, L.P.; GTCR Associates VI; Edgar D. Jannotta, Jr.; Murray Forman; Leonard Grunstein; Ventas; Ventas Realty, L.P.; and Rubin Schron. The Second District Court of Appeal reversed the judgment and remanded the case for further proceedings. *Shattuck*, 132 So. 3d at 914.

The Bankruptcy Court heard the motion to transfer on August 20, 2013, and took it under advisement. As it turned out, a ruling was unnecessary since the purpose of the motion was accomplished when the Bankruptcy Court entertained FLTCH and FAS's statute of limitations defense at the trial of the principal adversary proceeding (initiated by the Probate Estates) in September and October 2014 as affirmative defenses to the Probate Estates' claims. *See In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 384 ("Denial of the motions to dismiss [as time-barred] is without prejudice. The Defendants are free to raise the statute of limitations as an affirmative defense.").

On September 3, 2013, the District Court decided FLTCH and FAS's appeal of the Bankruptcy Court's January 30, 2013, order denying their motion to disqualify Shumaker. The District Court did so with these observations:

> Appellants contend the [T]rustee has a direct conflict with making decisions for [THMI] even though the debtor [FLTCI] owns 100% of the stock in THMI. Because of this asserted conflict, Appellants contend [T]rustee's counsel, [Shumaker], also has a conflict.
>
> . . .
>
> This asserted conflict is occasioned because of the unusual posture of this case. This is an involuntary bankruptcy brought by a creditor of THMI's parent corporation. By putting THMI's parent corporation [FLTCI,] in bankruptcy rather than THMI, the

creditors are allowed to continue to pursue litigation against THMI.

Since THMI is not the debtor, it does not receive any of the benefits of bankruptcy, such as an automatic stay of civil litigation against it.  Therefore, civil litigation has been proceeding against THMI outside the control of the Bankruptcy Court.  The [T]rustee has been making decisions (such as allowing "claims") for THMI as if THMI were in bankruptcy.

It is apparent that a decision needs to be made whether in fact THMI and the Debtor should be treated as the same entity under theories of alter ego, substantive consolidation, or other legal or equitable theory.  If so, THMI should be brought into the bankruptcy as a debtor which would afford it the benefits of bankruptcy as well as the burdens.  If THMI is not to be treated as the same entity as the debtor, then the litigation against THMI may be moot in this bankruptcy estate and the issues involved in this appeal may become moot.

Order of Remand at 1–2, *In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. Sept. 5, 2013).  The District Court therefore remanded the case with the instruction that the Bankruptcy Court determine at the earliest practical time whether "THMI should be brought into the bankruptcy case as a debtor."

★          ★          ★

*Commentary*

The District Court observed the obvious.  Other than the Jackson Estate, none of the Probate Estates had a claim against the Debtor.  Their claims were against THMI, an entirely separate entity.  And they could not be allowed in the Debtor's estate.  That is why it was necessary that the Bankruptcy Court consider THMI, qua separate entity, as a bankrupt entity together with FLTCI.

⋆          ⋆          ⋆

The Bankruptcy Court followed the District Court's lead on September 12, 2013.  In a Memorandum Opinion, the Bankruptcy Court held that the Bankruptcy Court was the proper forum for Wilkes's fraudulent transfer claims.  *In re Fundamental Long Term Care, Inc.*, 500 B.R. 147 (Bankr. M.D. Fla. 2013).  In doing so, the Bankruptcy Court addressed Wilkes's argument that the Probate Estates should be allowed to continue their state court litigation:

> In asking the Court not to enjoin their efforts in state court, the creditors argue the Court should be guided by the Trustee's judgment as to what is in the best interests of the estate.  That is not quite right.  The Court is first and foremost guided by the Bankruptcy Code.  And the Bankruptcy Code grants this Court exclusive jurisdiction over property of the estate. There is no question in the Court's mind that continuation of the proceedings supplementary—given the Estate of Nunziata's acknowledgement that the assets that were allegedly transferred to the "targets" belong to THMI—is an attempt (even if unintentional) to obtain or take control of property of the estate, and that alone warrants requiring the creditors [the Probate

64                    Opinion of the Court                    21-10587

> Estates] to pursue any fraudulent transfer or alter ego
> claims in this Court.

*Id.* at 160.  The Bankruptcy Court then set a hearing to set "the parameters of a single proceeding—involving the Trustee, the creditors, and the 'targets'—for resolving any fraudulent transfer and alter ego claims." *Id.*  The Trustee, as a hypothetical creditor of THMI, could not mount fraudulent transfer causes of action against FLTCH and the Targets unless THMI was in bankruptcy.

★          ★          ★

### *Commentary*

As evidenced by the various disputes over control of THMI's defense strategy, the Chapter 7 proceeding pitted Wilkes, the Probate Estates, the Trustee, and Shumaker against FLTCI, FLTCH, and the Targets.

### III.

### *A.*

On October 1, 2013, the Probate Estates initiated an adversary proceeding in the Bankruptcy Court against 16 entities and individuals with a two-count complaint for declaratory relief.[68] Count I alleged that six of the defendant parties assumed the debts

---

[68] The defendant parties were: GECC; FAS; THI-Baltimore; GTCR Golder Rauner, LLC; FLTCH; Murray Forman; Leonard Grunstein; Rubin Schron; Ventas, Inc; Ventas Realty, LP; GTCR Fund VI, LP; GTCR Partners VI, LP; GTCR VI Executive Fund, L.P.; GTCR Associates VI; Edgar D. Jannotta, Jr; and THI-Holdings.  Each count rested on 502 paragraphs of allegations.

and liabilities of THI, THMI, and FLTCI as successors to those entities.  Count II alleged that eleven of the defendant parties were the alter egos of THI, THMI, and FLTCI and therefore assumed their debts and liabilities.

On October 24, 2013, the Trustee moved the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 7024[69] for leave to intervene as a party plaintiff to bring additional claims that constitute the property of the Debtor's estate.[70]  The Bankruptcy Court granted the motion on October 31 and, on November 18, the Trustee filed a Complaint in Intervention which added a Count III to the Probate Estates' complaint "to substantively consolidate THMI into the Debtor's bankruptcy estate."  Count III alleged that "[t]there is such a unity of interest and ownership between FLTCI and THMI that the independence of each corporation had, in effect, never begun, and therefore adherence to the fiction of separate identities serves only to defeat justice."

The next day, in a Memorandum Opinion on Motions for Temporary Injunction and Motion to Approve Compromise, the

---

[69] The Trustee stated in her motion that Rule 9024 incorporates Federal. Rule Civil Procedure 24.  But actually, Rule 7024 incorporates that rule, which allows intervention by a party that "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).

[70] On November 13, 2013, in a Memorandum Opinion on the Trustee's Motion to Enlarge Time Period to Bring Avoidance and Other Actions, the Bankruptcy Court extended the two-year limitations periods in sections 108 and 546 of the Bankruptcy Code to April 13, 2014.

Bankruptcy Court concluded that "THMI's fraudulent transfer and alter ego claims (if any) potentially belong to the estate" and enjoined the Probate Estates "from pursuing any proceedings supplementary or other collection efforts that could conceivably affect property of the estate." *In re Fundamental Long Term Care, Inc.*, 501 B.R. 770, 774, 784 (Bankr. M.D. Fla. 2013). The Bankruptcy Court also denied a motion to compromise made by the Trustee (involving the claims of the Sasser, Jones, and Townsend Probate Estates) because one of its provisions would allow the Probate Estates to maintain their lawsuits against THMI, suggesting that the Bankruptcy Court viewed lawsuits against THMI as affecting property of FLTCI. *Id.* at 784.

The Probate Estates amended their adversary complaint on December 19, 2013. This pleading consisted of 228 pages with 1201 paragraphs and 22 counts. It was a typical shotgun complaint in that each count incorporated all preceding paragraphs of the complaint such that Count XXII was an amalgamation of all counts.

On March 14, 2014, the Bankruptcy Court, in a Memorandum Opinion on Motions to Dismiss, identified the counts and the claims they asserted. According to the Bankruptcy Court:

> The twenty-two counts in the complaint can be broken down into eight claims for relief: one count for substantive consolidation by the Trustee (Count I), two counts for breach of fiduciary duty (Counts II & III), four counts for aiding and abetting a breach of fiduciary duty (Counts IV–VII), one count for successor liability (Count VIII), two counts for piercing the

> corporate veil (Counts IX & X), three counts for alter-ego liability (Counts XI–XIII), eight counts for (actual or constructive) fraudulent transfer (Counts XIV–XXI), and one count for conspiracy to commit a fraudulent transfer (Count XXII).

*In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 372 (Bankr. M.D. Fla. 2014).

⋆        ⋆        ⋆

*Commentary*

Before passing on the sufficiency of any of the counts, though, the Bankruptcy Court shared the frustration Judge Merryday expressed on November 8, 2013, in reviewing a complaint Wilkes filed in the Middle District of Florida on behalf of the Jackson Estate against McGraw-Hill Companies, Inc.; Standard & Poor's Financial Services, LLC; Credit Suisse Securities (USA), LLC; and Credit Suisse First Boston Mortgage Securities Corporation. *See Jackson-Platts v. McGraw-Hill Cos.*, No. 8:13-cv-850-T-23MAP, 2013 WL 6440203, at ⋆1 (M.D. Fla. Nov. 8, 2013). This complaint alleged that "the [Jackson] Estate holds a $110 million judgment against [THI], and [THMI] . . . which is uncollected." *Id.* The complaint and charged the defendants with

> an expansive and enduring conspiracy among an array of conspirators, including S & P and Credit Suisse, who together allegedly undertook "a shell game" effected by a scheme the complaint denominates a "Propco–Opco–Oldco" (P–O–O) business structure, designed to "loot the assets" of the THI entities,

among many other targets, and—as part of an "unlawful and improper professional liability and general liability claim reduction strategy"—designed to render the THI entities unable to satisfy the [Jackson] Estate's judgment. The conspiracy allegedly sought to further the malevolent purpose of capturing enormous profit for the conspirators at the expense of nursing home occupants.

*Id*. Judge Merryday described the complaint as "a confusing, ambiguous, generalized, conclusory, and uninformative (and intermittently melodramatic) paper" and dismissed it.[71] *Id*. at *4, *6.

---

[71] The judge said a bit more:

> The complaint requires considerable energy to read with patience and to attempt to understand with confidence. Although alleging an encompassing, malevolent, and predatory scheme, the complaint provides to the disinterested reader little or nothing on which to conclude that the allegations arise from a sound factual basis or, more to the point, that the pleader has even the least notion that the allegations arise from a sound factual basis. The constant attribution of acts to "the Defendants" and "the Co–Conspirators" disguises much information necessary to glean the meaning, if any, of the allegations. The almost entire absence of allegations of time, place, and manner and the pertinent absence of the identity of the particular actors is wholly disabling to the disinterested reader. These omissions are so impairing and so obvious that the disinterested reader tends to doubt their inadvertence.

*Jackson-Platts v. McGraw-Hill Cos.*, 2013 WL 6440203, at *4.

21-10587                Opinion of the Court                69

On December 6, 2013, Wilkes voluntarily dismissed the case.[72]

★          ★          ★

Nevertheless, despite the deficiencies in this amended complaint, the Bankruptcy Court, "(particularly given the two years it ha[d] spent dealing with all of these parties in the main bankruptcy case) [wa]s able to glean the meaning of the critical allegations—albeit not without considerable energy." *In re Fundamental Long Term Care, Inc.*, 507 B.R. at 386.

In ruling on the motions, the Bankruptcy Court indicated how it viewed the case. To the Bankruptcy Court, it was obvious that

> the main thrust of this case is the Plaintiffs' claims for fraudulent transfer. In all, the Plaintiffs allege a total of eight counts for fraudulent transfer against the Defendants (Counts XIV–XXI).
>
> . . .
>
> The complaint unquestionably states claims for fraudulent transfer against THI–Baltimore and FLTCH.
>
> . . .
>
> [T]he facts of the complaint plausibly allege that the transfer of THMI's assets to FLTCH was for the benefit of Forman and Grunstein since they owned FLTCH—a closely held company.

---

[72] Wilkes dismissed the case pursuant to Fed. R. Civ. P. 41(a)(1).

*Id*. at 380–81.  In essence, the Bankruptcy Court viewed the Probate Estates' sprawling and tangled amended complaint as simply a fraudulent transfer action.  That said, it was clear to the Bankruptcy Court that the plaintiffs "fail[ed] to state a claim for relief under any alter-ego or veil-piercing theories." *Id*. at 386.  Plaintiffs did, however, state claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraudulent transfer, conspiracy to commit fraudulent transfer, and successor liability against a variety of defendants.  *Id*.

The Bankruptcy Court dismissed the remaining claims without prejudice and with leave to amend.  *Id*.  It granted leave with the expectation that the amendment would cure the many defects of the amended complaint.  *Id*.  In passing on the sufficiency of the claims asserted in the amended complaint, the Bankruptcy Court did not consider the defendants' argument that the claims were time-barred.  It stated that the defendants' statute of limitations grounds for dismissing the adversary proceeding would be treated as affirmative defenses and addressed later *See id*. at 384.

On April 4, 2014, the Probate Estates filed a second amended complaint with 32 claims—more claims than were contained in the first amended complaint.  Instead of rehabilitating the dismissed claims and curing the previous complaint's defects, the second amended complaint: (1) incorporated several hundred paragraphs of the first amended complaint by reference; (2) repleaded five claims the Bankruptcy Court had dismissed in their entirety; (3)

21-10587                Opinion of the Court                71

offered a new, but largely repetitive, restatement of several claims; and (4) added four new claims against several defendants.

The defendants responded to the second amended complaint by filing motions to dismiss.[73]  On June 26, 2014, the Bankruptcy Court dismissed the following claims: "alter ego liability (Count 23), aiding and abetting against Schron (Count 26), abuse of process (Count 27), conspiracy to commit abuse of process (Count 28), negligence (Count 29), fraudulent transfer against Schron (Count 30), civil conspiracy against GECC (Count 31), and avoidance of a post-petition transfer (Count 32)."  The Bankruptcy Court then gave the plaintiffs seven days to file another amended complaint restating the claims that had not been dismissed.

In the end, the claims that survived were: (1) a claim for substantive consolidation of THMI and FLTCI; (2) two claims of breach of fiduciary duty; (3) six claims of aiding and abetting breach of fiduciary duty; (4) a request for declaratory relief against FLTCH, FAS, and THI-Baltimore on a successor liability theory; (5)

[73] While the motions were pending, on June 2, 2014, the Trustee commenced an adversary proceeding against Troutman in the Bankruptcy Court.  The complaint alleged the following: Count I, a claim for negligence in abandoning FLTCI in *Jackson* resulting in a $110 million judgment; Count II, negligence in failing to inform FLTCI and its sole shareholder of their right to independent counsel in connection with the March 2006 transaction—the bust-out scheme—in which FLTCI acquired THMI; Count III, fraudulent concealment of the harm the March 2006 transaction could cause FLTCI; Count IV, fraud—participating in a scheme that defrauded FLTCI, THMI, and their creditors; and Count V, negligent supervision of a Troutman employee.

one claim each of actual and constructive fraudulent transfer; and (6) one claim of civil conspiracy to commit fraudulent transfer. The Bankruptcy Court concluded that "any further attempts by the Plaintiffs to amend their complaint would be futile or unfairly prejudicial to the Defendants." *In re Fundamental Long Term Care, Inc.*, 512 B.R. 690, 707 (Bankr. M.D. Fla. 2014).

On August 26, 2014, as the Bankruptcy Court and the parties were preparing for a trial on the remaining claims of the second amended complaint, the Bankruptcy Court denied the defendants' motions for summary judgment without a hearing in a two-page order.[74]

The trial of the case began on September 22, 2014. It ended fifteen days later, on October 7. On December 16, the Bankruptcy Court tentatively announced the following findings of fact and conclusions of law:

(1) FLTCI and THMI are consolidated and ought to be treated as if they are one.

(2) The claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty fail for lack of proof. Indeed, "the evidentiary record shows that the challenge[d] transactions were entirely fair."

---

[74] There was one exception. On September 15, 2014, the Bankruptcy Court granted Ventas and Ventas Realty, LP summary judgment on one count of aiding and abetting breach of fiduciary duty.

(3) The claims of constructive fraud and actual fraud fail for lack of proof that THMI's assets were sold to defraud THI or THMI's creditors.  The transferor of THMI was THI.  THI sold 100% of THMI's shares to FLTCI, but THI did not do so to defraud its creditors or THMI's creditors.

(4) The claim of successor liability is established.  "FAS and possibly [THI-Baltimore] and FLTCH [we]re the mere continuation of THMI and . . . the 2006 transaction [the bust-out scheme] was a fraudulent effort to avoid the liability of a predecessor corporation."  "The parties appear to agree that the Delaware law governs" whether the successor liability claim is time-barred.  The statute of limitations' three-year prescriptive period began to run when the March 2006 transaction closed, and the plaintiffs didn't file their successor liability claim until October 1, 2013.  The Bankruptcy Court tolled this time period because the injury sustained was "inherently unknowable," and the plaintiffs' claims were "concealed" by the defendants.

Following the conclusion of the adversary proceeding, on January 9, 2015, Wilkes, for the Townsend Estate, moved the Bankruptcy Court "for Relief to Comply with the Mandate of the Florida Second District Court of Appeal" in *General Electric Capital Corp. v. Shattuck*, 132 So. 3d 908 (Fla. 2d Dist. Ct. App. 2014).  Wilkes asked that the Townsend Estate be allowed to "proceed with its motion

to alter or amend the judgment" it procured in the state court wrongful death action to include the 16 parties it wished to be bound by the Townsend Estate's $1.1 billion judgment in that action. Following a hearing on May 27, 2015, the Bankruptcy Court denied that motion without prejudice.

Meanwhile, on February 2, 2015, the Bankruptcy Court issued an order requiring the Trustee, the "Fundamental Defendants,"[75] the Probate Estates, and other interested parties to submit to mediation on February 3–4, 2015. The parties attended mediation on February 3, 4, 5, 9, and 10. Also on February 10, the Bankruptcy Court granted the Trustee's motion to "consolidate" the bankruptcy to include THMI, pursuant to the Bankruptcy Court's finding that FLTCI and THMI could be treated as one.

On February 23, 2015, the Trustee moved the Bankruptcy Court to compromise two controversies involving the Trustee, the Probate Estates, and the Fundamental Defendants.

The Trustee presented two compromises. In one, the Fundamental Defendants would pay the Trustee $18.5 million[76] and would receive the Trustee's and Probate Estates' general releases

---

[75] The "Fundamental Defendants" included FLTCH, FAS, FCC, THI-Baltimore, Murray Forman, and Leonard Grunstein.

[76] $4 million of that amount would be paid over time.

and a bar order in exchange.[77]  *In re Fundamental Long Term Care, Inc.*, 527 B.R. 497, 507–08 (Bankr. M.D. Fla. 2015).  The second compromise was with the Quintairos law firm.  It would pay the Trustee $1.25 million and receive general releases like the ones the Fundamental Defendants would receive, as well as the same bar order. *Id.* at 508.

In addressing the motions in its March 20 Memorandum Opinion on Motion to Compromise and Motions for Permanent Injunctive Relief, the Bankruptcy Court described what the Chapter 7 case had become: "at least 27 lawsuits and 15 appeals before 13 different courts and 17 judges in 5 states" involving 16 defendants.[78]  *Id.* at 501.  The Bankruptcy Court listed the defendants and their tentative dispositions.  *Id.* at 501 n.6.  In short, only five of the defendants were *potentially* liable on a successor liability theory.

The Bankruptcy Court then assessed the compromises under the *Justice Oaks* factors[79] and found that they met the factors.

---

[77] Third parties, such as the non-settling defendants that prevailed, would be barred from asserting claims against the Fundamental Defendants arising out of or relating to the claims the Fundamental Defendants were released from.

[78] The Bankruptcy Court provided the citations for the 18 reported decisions the litigation had spawned.  *In re Fundamental Long Term Care, Inc.*, 527 B.R. at 501 n.5.

[79] Those factors are: (i) the probability of success in the litigation between the settling parties; (ii) the difficulties, if any, to be encountered in collection; (iii) the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interests of the creditors

*Id.* at 509. But it stated it would only approve "the proposed compromises and bar orders conditioned on the entry of a final, non-appealable order enjoining the Probate Estates from pursuing any claims arising out of the nucleus of facts set forth in the adversary complaint in this proceeding." *Id.* at 517. The Probate Estates were free to appeal any of the Bankruptcy Court's orders, as well as litigate their negligence claims against the THI Receiver and in *Jones, Sasser*, and *Webb*. *Id.*

> But they [we]re enjoined from (i) pursuing any pending proceedings supplementary; (ii) litigating their civil rights claim against the GTCR Group, GECC, and Ventas; and (iii) pursuing any claims against the GTCR Group, GECC, Ventas, and Schron as "real parties in interest" in the *Townsend*, *Jones*, or *Sasser* cases.[80] In short, there will be no sequel.

---

and a proper deference to their reasonable views. *Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990).

[80] The Bankruptcy Court added this footnote:

> In *Townsend*, the Townsend Estate obtained a $1.1 billion verdict against THI. After the trial, the Townsend Estate attempted to add the non-settling Defendants to the judgment as the "real parties in interest." The Sasser and Jones Estates similarly attempted to add the non-settling Defendants as defendants in those state court actions—albeit before judgment—based on the same "real party in interest" theory. All three of those cases have been removed to this Court. In the Court's view, the "real party in interest" theory, which is based on the January 5 settlement agreement [between the THI Receiver and Targets], is completely without merit. In any case,

*Id.*

On March 23, the Bankruptcy Court entered an order approving the Trustee's proposed compromises; the approval was conditioned on the entry of an injunction permanently enjoining the Probate Estates from pursuing claims against any of the non-settling defendants—in other words, the non-Fundamental Defendants. In addition to enjoining them in the manner it described on March 20, the Bankruptcy Court also enjoined the Probate Estates from "pursuing any claims against the non-settling Defendants arising out of the nucleus of facts set forth in the adversary complaint in this proceeding." The Bankruptcy Court added this proviso: "In the event any part of this Order is reversed on appeal, the Motion to Compromise shall not be approved, and none of the terms of the parties' compromise shall become effective."

On March 27, 2015, the THI Receiver appealed the Bankruptcy Court's decisions from March 20 and 23. On April 3, the Probate Estates appealed the Bankruptcy Court's March 20 Memorandum Opinion and the final judgment it entered on March 27.

⋆          ⋆          ⋆

---

it is essentially the same as several of the claims asserted here just recast under a different name, and even if it is somehow distinct, that claim could have been litigated here.

*In re Fundamental Long Term Care, Inc.*, 527 B.R. at 517 n.113.

*Commentary*

As the Bankruptcy Court recognized, "the main thrust of this case is the Plaintiffs' claims for fraudulent transfer." Wilkes let the Probate Estates' fraudulent transfer claims extinguish to preserve its ability to seek multimillion-dollar jury verdicts in state court, then filed a baseless Chapter 7 petition against an inoperative shell corporation with no assets—not even potential causes of action against FLTCH and the Targets. This, Wilkes thought, would essentially set the Trustee to work for Wilkes. In the bankruptcy proceeding, the Trustee could discover evidence that Wilkes could not discover in various state court wrongful death cases. Wilkes could use this evidence to potentially bring unrelated claims against the defendant entities.

*B.*

On September 9, 2015, the Trustee moved the Bankruptcy Court: (i) to approve another compromise, this time between the Trustee and the bankruptcy estate's professionals; (ii) to reconsider and vacate in part the March 20 Memorandum Opinion and the March 23 Order approving the two compromises described above; (iii) to enter a separate opinion or order unconditionally approving the $18.5 million settlement; and, if appropriate, (iv) to enter a separate opinion or order addressing the Targets' requests for permanent injunction, independent of the compromises discussed herein, subject to the ongoing rights of all parties. The Settlement Term Sheet attached to this motion provided that the proceeds of any claims against Troutman would be placed in a Litigation Trust

for the benefit of deferred litigation expenses and the Probate Estates, that the Trustee (of the instant bankruptcy estate) would serve as trustee of the Litigation Trust, and that she would take "direction from a steering committee made up exclusively by the Probate Estates and their representative(s)."

Following a hearing on October 5, the Bankruptcy Court granted the compromise in an order entered on October 23, 2015. The order adhered to the Bankruptcy Court's position in its March 20 Memorandum Opinion that the $18.5 million settlement satisfied the *Justice Oaks* factors, but the order declined to condition approval of the settlement on a permanent non-appealable injunction. The Bankruptcy Court concluded that the compromise was "fair and equitable in light of the permanent injunction the [Bankruptcy] Court will enter enjoining the Probate Estates from pursuing any claims against the non-settling Defendants arising out of the same nucleus of facts" alleged in the complaint the Probate Estates filed in initiating the adversary proceeding back on October 1, 2013.

On October 28, 2015, the Bankruptcy Court entered an order granting the Trustee's amended motion for approval of the third compromise—the compromise between the Trustee, the bankruptcy estate professionals, and the Probate Estates—which included a payment to Shumaker: $5 million as an attorney's fee and costs of $620,148.48, for a total payment of $5,620,148.48. In addition, the order approved the continuing work of the Trustee found in the Settlement Term Sheet, providing that the proceeds

of "[a]ny bankruptcy estate claims against [Troutman] and related parties [were to] be put into a Litigation Trust" administered pursuant to the Settlement Term Sheet and that the Trustee would serve as the trustee of the Litigation Trust after concluding her duties as Trustee of the bankruptcy estate. The Bankruptcy Court also approved the payment of certain administrative expenses and the distribution of the balance:

> [The] Initial Settlement Proceeds [go] to the trust account of Wilkes & McHugh, P.A. . . . for distribution to the Probate Estates in accordance with the existing fee agreements between them and their professionals, as well as applicable Florida and Pennsylvania law regarding settlements of personal injury and wrongful death claims, trust accounts, and contingency fee agreements.

Finally, the Court granted four motions to compromise: one with the Quintairos firm for $1.25 million; a second with GTCR-related parties for $1.5 million; a third with Ventas and GECC for $250,000 and $1.5 million, respectively; and a fourth with the THI Receiver for $700,000—for a total of $5.2 million. Added to the $18.5 million the Trustee received from the Fundamental Defendants, the Trustee received settlements totaling $23.7 million. Of the $23.7 million, the Probate Estates received about $16.2 million. But as provided in settlement agreements between the Estates and their attorneys, each estate received $1 million, less a $50,000 future

21-10587                Opinion of the Court                81

cost reserve. The attorneys received the remainder as fees and costs.[81]

On December 22, 2015, the Bankruptcy Court entered an order granting Berman and Shumaker's motion to withdraw as special litigation counsel. The order provided that Shumaker would "continue to assist with preparation of the Litigation Trust Agreement" referred to in the October 28 order "at no additional cost to the Trustee."

## C.

While the adversary proceeding Wilkes initiated on October 1, 2013, was coming to a close, the adversary proceeding the Trustee initiated against Troutman on June 2, 2014,[82] was still pending on a motion to dismiss the complaint for failure to state a claim for relief. Because the Troutman adversary proceeding affected the ongoing work of the Trustee, Berman, and Shumaker through the Litigation Trust as described above, the opinion now turns to that litigation.

On December 8, 2015, the Bankruptcy Court granted Troutman's motion, dismissing Count I with prejudice and Counts II–V with leave to amend. On May 6, 2016, the Trustee filed an amended complaint against Troutman alleging four counts: conspiring with FLTCH and others to defraud, and actually defrauding, THI's

---

[81] The law firms receiving these fees were: Wilkes; Howell & Thornhill, P.A.; Stichter, Riedel, Blain & Postler, P.A.; and Kynes, Markman & Feldman, P.A.

[82] *See supra* note 73.

creditors; aiding and abetting the fraud; aiding and abetting FLTCH's conversion of THMI's assets; and aiding and abetting THI's officers' breach of their fiduciary duties to THMI.

Troutman answered the amended complaint, denying the allegations of wrongdoing and asserting 29 affirmative defenses. The Trustee and Troutman thereafter entered into a settlement agreement which required Troutman to pay FLTCI's bankruptcy estate the sum of $6.5 million—placed in the Litigation Trust—in exchange for a bar against future claims. On December 16, 2016, the Trustee moved the Bankruptcy Court to approve that settlement agreement. Wilkes objected to the Trustee's motion on January 27, 2017. After a hearing, on May 17, 2017, the Bankruptcy Court granted the Trustee's motion. The Bankruptcy Court ruled without considering Wilkes's objection to the compromise because the Probate Estates "lack[ed] a pecuniary interest" in the matter. On May 31, Wilkes appealed the Bankruptcy Court's decision to the District Court.

On February 2, 2018, the Trustee moved to dismiss the appeal on the ground that the Probate Estates did not have standing to challenge her settlement with Troutman because the Probate Estates were not "persons aggrieved." The Probate Estates had been "cashed-out" of the bankruptcy case, meaning that they would receive nothing from the $6.5 million Troutman settlement.

Rather, the entire sum would go to Wilkes (in the form of attorney's fees and costs).[83]

On May 30, 2019, in the midst of Wilkes's attempts to disqualify Shumaker and the bankruptcy judge, explained *infra* part IV, the District Court issued an order holding that the Probate Estates had standing to challenge the Troutman compromise agreement, vacating the Bankruptcy Court's order approving the settlement, and remanding the matter so that the Bankruptcy Court could determine in the first instance whether the Trustee had violated the provisions of the Settlement Term Sheet—which was part of the compromise—by settling with Troutman without the Probate Estates' approval.

On August 2, 2019, the Bankruptcy Court, on remand, granted the Trustee's motion to approve the Troutman compromise. The Bankruptcy Court explained that because the Trustee had not been discharged from her duties as Trustee of the bankruptcy estate and the Bankruptcy Court had not approved the Litigation Trust, the Trustee had the authority to enter into the settlement with Troutman in her capacity as Chapter 7 Trustee.

Wilkes appealed the Bankruptcy Court's decision on August 16, 2019, and on September 30, 2020, the District Court affirmed. The District Court first held that the Bankruptcy Court did not

---

[83] We assume in this opinion that Wilkes would share the proceeds of the Troutman settlement with the other lawyers who represented the Probate Estates.

abuse its discretion in concluding that the Trustee had the authority to enter into a settlement with Troutman because, according to the plain language of the Settlement Term Sheet, the Probate Estates could not gain control over any potential settlements until the bankruptcy closed and the Trustee transitioned from Chapter 7 trustee to the trustee of the Litigation Trust. The District Court also held that the Bankruptcy Court did not commit plain error by finding the Troutman settlement fair because the Bankruptcy Court's determination had "substantial evidentiary support."

Wilkes filed a motion for reconsideration on October 28, 2020. The District Court denied the motion on December 18, 2020. The settlement with Troutman became final on January 20, 2021, and on February 19, 2021, Troutman paid the Bankruptcy Estate $6.53 million.

## IV.

### A.

While the dispute over the Troutman compromise was playing out, several other disputes arose. These disputes stemmed from a potential conflict of interest on Shumaker's part. In short, Wilkes believed Shumaker to have a conflict of interest and moved to disqualify the firm from participating in the bankruptcy proceedings and disgorge the attorney's fees it had received. But Wilkes also believed that Chief Bankruptcy Judge Williamson had a conflict of interest and moved to have him recused so that another judge could decide the motion to disqualify Shumaker.

According to Berman, some time after the Bankruptcy Court approved the Trustee's compromise with Troutman, Wilkes approached the Trustee, her general counsel—Watkins—and the Office of the United States Trustee, and alleged that Shumaker had an undisclosed conflict of interest while representing the Trustee such that Shumaker could not be considered "disinterested" under 11 U.S.C. § 327(a). The alleged conflict was based on Shumaker's long-standing legal representation of Healthcare REIT, Inc. ("HCN"). Berman and Shumaker considered the allegation to be meritless, so on May 4, 2018, under the penalty of perjury, Berman filed a "Supplemental Disclosure" with the Bankruptcy Court, which focused on Shumaker's relationship with HCN.

The Supplemental Disclosure revealed the following: Shumaker had represented HCN, "a publicly traded real estate investment trust based in Toledo, Ohio," for thirty years as outside counsel "in corporate, real estate, and other transactional matters." HCN's only connection with any of the Probate Estates was its ownership of real estate leased to Lyric Health Care Holdings III, Inc., the owner and operator of the Auburndale Oaks nursing home in which Townsend and Jackson once resided. Under the lease, HCN surrendered possession and control of the premises to its lessee and therefore had no liability for injuries to anyone on the premises. In the complaint it filed in *Townsend* (in state court) in January 2009, Wilkes named HCN as a defendant. But once it appeared that HCN had no involvement in the operation of the nursing home, Wilkes dismissed HCN from the case.

On June 4, 2018—while the Trustee's motion to dismiss the Probate Estates' appeal of the Bankruptcy Court's May 17, 2017, order approving the Troutman compromise was pending in the District Court—Wilkes moved the Bankruptcy Court to disqualify Berman and Shumaker as the Trustee's special litigation counsel *nunc pro tunc* and require them to disgorge the $5,620,148.48 they received as costs and an attorney's fee.[84]  The motion asserted that the Bankruptcy Court should declare Berman and Shumaker disqualified from the moment the Trustee sought its approval of their employment as special litigation counsel because they were not disinterested as required by § 327(a).  Moreover, the motion alleged Berman and Shumaker failed to timely disclose their "connections with the debtor, creditors, [or] any other party in interest"—connections that revealed their disinterestedness—pursuant to Rule 2014.  While the Supplemental Disclosure revealed Shumaker's connections to HCN, as well as its relationship with the Auburndale Oaks property and the nursing home tenant, that disclosure was untimely, according to Wilkes.

Wilkes accompanied that motion with a second motion—this one seeking to "withdraw the reference" of the motion for disqualification and disgorgement.  If granted, the motion to withdraw the reference would place the motion for disqualification and disgorgement  before  the  District  Court,  rather  than  the

---

[84] We assume that the motion requesting disgorgement included the fee and costs because it refers to "all past and future compensation."

21-10587                Opinion of the Court                87

Bankruptcy Court. For that reason, the motion to withdraw the reference was placed on the District Court's docket on July 3.

The motion to withdraw the reference reiterated the reasons Shumaker should be disqualified: because HCN, which Shumaker had been representing for thirty years, "was the owner of the nursing homes where four of the six [Probate] Estates resided [and] was also a previous state court litigation adversary of the Townsend Estate [in *Townsend*]." The motion to withdraw the reference then leveled another allegedly disqualifying accusation, this one aimed at the bankruptcy judge presiding over the case—Chief Judge Williamson.

According to that motion, Chief Judge Williamson should not hear the motion to disqualify Shumaker because his law clerk, Edward J. Comey, had been an associate at Shumaker and had worked on bankruptcy cases with Berman. Had Shumaker disclosed that information in the Supplemental Disclosure before its appointment as special litigation counsel, Chief Judge Williamson could have considered whether to recuse himself—especially if Comey's history had come to light.

The District Court issued an order denying Wilkes's motion to withdraw the reference on November 1, 2018. In doing so, it dealt straightforwardly with the points Wilkes made in the motion to withdraw the reference:

> The [Probate E]states contend in the motion that *Shumaker's representation of HCN*, an owner of nursing facilities, creates a disqualifying conflict of interest.

> Also, the estates contend that Shumaker failed to disclose that *a law clerk for the bankruptcy judge is a former Shumaker associate and is married to a Shumaker partner.* Armed with these conflict theories, the [Probate E]states demand that Shumaker disgorge all fees earned in representing the trustee. . . .

> The bankruptcy judge's determination of the disqualification motion promotes the efficient use of judicial resources and advances uniformity in bankruptcy procedure. The bankruptcy judge enjoys the advantage of presiding for six years over litigation involving the estates, the trustee, and their counsel. The bankruptcy judge "bring[s] a unique expertise to the question of when simultaneous representation . . . is a conflict that works to the detriment of the estate in bankruptcy [or] its creditors." And the bankruptcy judge "is on the front line, in the best position to gauge the ongoing interplay of factors and to make delicate judgment calls" about the retention and disqualification of counsel.

> The resolution of a motion to disqualify counsel in this circumstance is a core proceeding and the pertinent considerations decisively favor denying withdrawal.

Order Denying Motion to Withdraw the Reference at 1–3, *Estate of Juanita Jackson v. Scharrer*, No. 8:18-cv-01602 (M.D. Fla. Nov. 1, 2018) (third and fourth alterations in original) (emphasis added) (citations omitted).

21-10587                Opinion of the Court                89

After failing in the District Court, on January 17, 2019, Wilkes moved both Chief Judge Williamson and his law clerk to recuse pursuant to 28 U.S.C. § 455 and Federal Rule of Bankruptcy 5004.[85]  The motion for recusal essentially tracked the points the District Court elaborated on in its November 1 order: Shumaker's longstanding client, HCN, owned nursing facilities involved in the bankruptcy case; Chief Judge Williamson's law clerk was a former Shumaker associate and is married to a Shumaker partner; and all of this created an unacceptable conflict.

On June 7, 2019, Chief Judge Williamson decided Wilkes's recusal motion.  He observed that § 455(b) "provides for the recusal

---

[85] 28 U.S.C. § 455 provides in relevant part:

> (a) Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances:

> 1.  Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

> 2.  Where in private practice he served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter.

Rule 5004 provides: "[a] bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arise[] or, if appropriate, shall be disqualified from presiding over the case."  Fed. R. Bankr. P. 5004(a).

of a judge if the judge's spouse has an interest that could be affected by the outcome of the case, or if the judge has a personal bias or personal knowledge of disputed facts in the case." Chief Judge Williamson read Wilkes's motion as centering on these points: (1) "that Comey was previously associated with Shumaker"; (2) that Comey "may have personal knowledge of the relationship" between HCN and Shumaker; (3) that "Comey's spouse has a financial interest in Shumaker"; and (4) that "Comey's conflict should be imputed to the Court," thereby necessitating the Bankruptcy Court's recusal.

In responding to these points, Chief Judge Williamson stated that he screened Comey from the case following the filing of the motion to disqualify Shumaker and would not impute Comey's prior association with Shumaker or Comey's wife's status with the law firm to himself. The judge acknowledged that

> in evaluating a request for recusal of a judge, Courts should consider whether there is an actual and reasonable doubt concerning the judge's impartiality. Congress has required that a judge's impartiality must *reasonably* be questioned before the judge recuses himself, "because there is a need to prevent parties from manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking."

> *In this case, the timing and circumstances of the Recusal Motion suggest that the request may stem from a search for a different judge to consider the Disqualification Motion and related issues, rather than a concern for the Court's impartiality.*

The Probate Estates filed the Disqualification Motion and the Recusal Motion, but will retain no money from any settlements reached by the bankruptcy estate. Wilkes, as attorney for the Probate Estates, has admitted that the Probate Estates "[a]re not going to get any cash" from future settlements generated by the Trustee. Instead, the Probate Estates have contractually agreed to convey any distributions from the bankruptcy estate to their attorneys as payment of the attorneys' deferred fees and costs totaling more than $7 million.

In the Disqualification Motion, the Probate Estates seek the disgorgement from Shumaker of "any and all past and future compensation approved by this Court." *It appears, therefore, that the Probate Estates may seek to collect any funds that Shumaker is required to disgorge, solely in an effort to recoup their attorneys' deferred fees and costs.* To the extent that the disgorged funds are property of the bankruptcy estate, the Court possesses jurisdiction over the ultimate award of the disgorged funds.

The Probate Estates initially moved to withdraw the reference of the Disqualification Motion in order to have it decided by a District Court judge. The Recusal Motion was filed only after the District Court denied the Motion to Withdraw the Reference, in part because the bankruptcy judge "enjoys the advantage of presiding for six years over litigation involving the estates, the trustee, and their counsel."

92                    Opinion of the Court                    21-10587

> Under these circumstances, the Court has considered whether the Recusal Motion was filed because of reasonable doubts about its impartiality, or whether the Recusal Motion was filed for the strategic purpose of obtaining a different judge, and finds that recusal is not warranted.

Order and Memorandum Opinion on Probate Estates' Motion for Recusal at 17–19, *In re Fundamental Long Term Health Care, Inc.*, No. 8:11-bk-22258 (Bankr. M.D. Fla. June 7, 2019) (alteration in original) (emphasis added) (citations and footnotes omitted).

On June 21, 2019, Wilkes moved the District Court for leave to appeal the interlocutory order denying its motion to recuse. The heart of Wilkes's argument, in the District Court's view, was that the "late screening of Comey was insufficient to cure the alleged bias" of Chief Judge Williamson.

On July 30, 2019, the District Court denied Wilkes leave to appeal because it established none of the three elements required under 28 U.S.C. § 1292(b) for an interlocutory appeal: (1) the appeal did not present a controlling question of law; (2) the appeal failed to present a substantial ground for difference of opinion; and (3) resolution of the appeal would not advance the ultimate determination of litigation.[86]

---

[86] The District Court noted that Wilkes had petitioned the District Court for a writ of mandamus requiring Chief Judge Williamson "to recuse himself from the entire Chapter 7 proceeding." That petition was pending before another district judge at the time the District Court denied Wilkes's motion for leave.

21-10587                Opinion of the Court                93

                              *B.*

On August 21, 2019, while Wilkes's appeal of the Bankruptcy Court's approval of the Troutman settlement was pending, the Bankruptcy Court decided the Probate Estates' motion to disqualify Berman and Shumaker and for disgorgement of their payment in a Memorandum Opinion. *In re Fundamental Long Term Care, Inc.*, 605 B.R. 249 (Bankr. M.D. Fla. 2019). The Bankruptcy Court began by noting why Wilkes filed the motion two and a half years after Shumaker's withdrawal from the case as the Trustee's special litigation counsel: "The attorneys were dissatisfied with the Trustee's settlement of the proceeding against Troutman . . . because the projected $2.8 million distribution to the Probate Estates from the settlement was insufficient to pay their deferred attorney's fees in the amount of $7,352,104.38."[87] *Id*. at 256.

---

[87] As the Bankruptcy Court noted:

> The [motion for disqualification and disgorgement] was also filed after the Probate Estates unsuccessfully objected to the Trustee's compromise of the proceeding against Troutman Sanders LLP. In the Objection, the Probate Estates complained that the Trustee's compromise improperly barred them from pursuing their own claims against Troutman, and that the compromise did not fairly disclose the amount of any distribution that the Probate Estates would receive from the settlement funds.

> The Probate Estates ha[d] already received approximately $16.2 million out of $23.7 million in settlements generated by the Trustee during the course of the bankruptcy case. Of the $16.2 million paid to the Probate Estates in the aggregate . . .

The Bankruptcy Court then turned to the argument Wilkes advanced in support of the Probate Estates' motion:

> In their Summary of Argument . . . the Probate Estates assert that they have uncovered connections between Shumaker and at least four entities that affected Shumaker's disinterestedness: (1) Healthcare REIT [HCN], which they assert is "an actual or potential adversary" of the Probate Estates and the bankruptcy estate; (2) two entities known as Lyric Health Care, LLC and Lyric Health Care Holdings III, Inc. (together, Lyric), which they assert are adversaries of the Probate Estates and THMI, the Debtor's subsidiary; and (3) Home Quality Management, Inc. (HQM), which they assert is an adversary of two of the Probate Estates.

*Id.* at 256.

As the Bankruptcy Court saw it, Wilkes was contending that Shumaker's connections to HCN, Lyric, and HQM rendered Berman and Shumaker "unable to fulfill [their] fiduciary duties to the

---

each individual probate estate actually received $1 million less a $50,000.00 "future cost reserve." The balance of the distribution paid to the Probate Estates from the bankruptcy estate was disbursed to their attorneys for their fees and other charges. Consequently, the six Probate Estates received less than $6 million from their total distribution of $16.2 million, and the remaining $10 million was used to pay the Probate Estates' attorney's fees and costs.

*In re Fundamental Long Term Care, Inc.*, 605 B.R. at 255–56 (footnote omitted).

only creditors in the bankruptcy case," the Probate Estates, and therefore incapable of being disinterested as required by 11 U.S.C. § 327(a). *Id.* at 256–57. In addressing this disinterestedness point, the Bankruptcy Court first recalled the service § 327(a) and Rule 2014 perform in the administration of a bankruptcy estate.

Section 327(a) authorizes a trustee, with the court's approval, to employ one or more attorneys or other professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties." *Id.* at 254 (quoting 11 U.S.C. § 327(a)). A "disinterested person" is a person who "does not have an interest *materially adverse* to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." *Id.* (emphasis added) (quoting 11 U.S.C. § 101(14)(C)). The Bankruptcy Code does not define the phrase "interest materially adverse to the estate." This Court has, however, and we define a "materially adverse interest" as

> an "economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant . . . or . . . a predisposition under the circumstances that render such a bias against the estate."

*Electro-Wire Prods., Inc. v. Sirte & Permutt, P.C.*, 40 F.3d 356, 361 (11th Cir. 1994) (alteration in original) (quoting *Roger J. Au & Son, Inc. v. Aetna Ins. Co.*, 64 B.R. 600, 604 (N.D. Ohio 1986)).

Federal Rule of Bankruptcy Procedure 2014 implements the disinterestedness provision of § 327(a) by requiring professional persons to make certain disclosures at the time they seek approval of their employment. Specifically, a professional must set forth any "connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014(a). Under the rule, a professional must disclose all "connections" to parties in interest "that are not so remote as to be *de minimis*." *In re Fullenkamp*, 477 B.R. 826, 834 (Bankr. M.D. Fla. 2011) (quoting *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994)) (internal quotations omitted).

As the Bankruptcy Court observed:

A professional who violates § 327(a) and Rule 2014 may be disqualified and may be required to disgorge any fees that they have received for the representation. Section 328(c) of the Bankruptcy Code, for example, provides that the Court may deny compensation to a professional person employed under § 327 if, at any time during the professional person's employment, he "is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." Similarly, a failure to disclose the connections required by Rule 2014 "can warrant disqualification, denial of compensation, and disgorgement of any compensation already received."

*In re Fundamental Long Term Care, Inc.*, 605 B.R. at 255 (footnotes omitted).

With these principles in hand, the Bankruptcy Court considered the arguments Wilkes advanced in support of the Probate Estates' motion. Wilkes's primary contention, as characterized by the Bankruptcy Court, was that "Shumaker also represent[ed] [HCN], which leased the underlying real property to certain of the nursing homes involved in the wrongful death actions." *Id*. at 252. Consequently, HCN's interest was "adverse to" the Probate Estates and to the bankruptcy estate, and Shumaker's representation of HCN was not timely disclosed to creditors or the Bankruptcy Court. *Id*.

Characterizing HCN as the owner of the real property leased to the nursing homes was only half true. HCN, according to Wilkes, was "the owner of the nursing homes where the majority of the [Probate Estates' decedents] resided." *Id*. at 257. And Lyric and HQM were adversaries of the Probate Estates and THMI.

The Bankruptcy Court meticulously examined the way in which HCN, Lyric, and HQM may have affected Shumaker's disinterestedness under § 327(a). Here is what the Bankruptcy Court found, starting with HCN.

#### HCN

It was undisputed that Shumaker represented HCN, a real estate investment trust, and had done so for several years. The only tangible connection between HCN and any of the Probate Estates occurred in June 2005, when HCN purchased the real property on which the Auburndale Oaks nursing home was located and in

which Townsend and Jackson resided.  Contrary to Wilkes's repre-
sentation, however, HCN did not own or operate the facility.  HCN
merely leased the property to a tenant—one of the Lyric entities—
and *that entity* operated the home.  As the Bankruptcy Court noted:

> Despite scores of hours of deposition testimony and
> thousands of exhibits developed through a joint dis-
> covery effort, [Wilkes] and the Trustee never consid-
> ered [HCN] as potentially liable to the bankruptcy es-
> tate because of any prepetition transactions.  In fact,
> [Wilkes] acknowledge[s] that [HCN]'s existence and
> contact with THI appeared in deposition exhibits,
> Bates-stamped documents, and other discovery mate-
> rials in the case.  But [HCN] never emerged from the
> materials as a potential target for recovery.  The
> March 2006 transaction [the bust-out scheme], for ex-
> ample, was "front and center" of the [Adversary] Pro-
> ceeding, but the joint investigation by the Trustee and
> [Wilkes] never revealed any potential claim against
> [HCN] arising out of a connection with THI.

*Id.* at 260 (footnote omitted).

The Bankruptcy Court cited a letter that Watkins, the Trus-
tee's general counsel, wrote to Wilkes on January 18, 2018—four
and a half months before Wilkes filed the motion to disqualify Shu-
maker as the Trustee's litigation counsel.  The letter was in re-
sponse to Wilkes's letter to Watkins of December 29, 2017, in
which Wilkes attached 18 items purportedly showing that Shu-
maker's relationship to HCN disqualified Shumaker from serving

as the Trustee's counsel.  The Bankruptcy Court quoted the following from Watkins's letter to Wilkes:

> The Involuntary [Chapter 7] petition was filed on December 5, 2011.  Despite your knowledge that [HCN] was a party to the Briar Hill suit for a short period of time, I have no records or recollection of [HCN] being a topic of discussion (as a potential target or otherwise) in the bankruptcy case.  [HCN] was also not a creditor in the bankruptcy case, and did not appear to have any ongoing business or contact with the Debtor, [FLTCI].  In fact, the first time [HCN] was brought to our attention is when you raised Shumaker's alleged conflict of interest in or about September 2017, nearly 6 years after the involuntary petition had been filed.

*Id.*

The Bankruptcy Court then stated that "[b]ased on [its] review of the documents sent by [Wilkes], the Trustee's general counsel did not see how [HCN] had any relationship to the Debtor[] and did not find a conflict created by Shumaker's representation of [HCN]." *Id.* (internal quotation marks omitted).  The Bankruptcy Court ended its analysis of the HCN issue by concluding that Shumaker's relationship with HCN was not disqualifying under § 327:

> In summary, [Wilkes] allege[s] that [HCN] had prepetition connections to THI that were not investigated in the bankruptcy case because of [HCN]'s attorney-client relationship with Shumaker.    But    the

prepetition transactions were the subject of exhaustive joint discovery and litigation in multiple proceedings, and neither [Wilkes] nor the Trustee ever considered [HCN] as potentially liable to the bankruptcy estate. For these reasons, Shumaker's representation of [HCN] did not lessen the value of the bankruptcy estate, create a potential dispute between the bankruptcy estate and [HCN], or create a circumstance that would generate a bias against the bankruptcy estate.

*Id.* at 260–61.

## Lyric

The Bankruptcy Court provided a brief explanation of Shumaker's relationship with Lyric:

[HCN] leased the property underlying the Auburndale Oaks nursing facility to Lyric . . . after [HCN] purchased the property in 2005, and Lyric thereafter operated the nursing home facility. [HCN] sold the property in December 2012. Shumaker acknowledges that Lyric may have made payments to Shumaker in relatively small amounts during Lyric's lease of the property[,] . . . such payments represent[ing] compensation for work performed by Shumaker for . . . [HCN]. Shumaker's services were not provided to Lyric, and Lyric made the payments only pursuant to its obligations under the lease.

*Id.* at 261.

Summarizing, the Bankruptcy Court found that "Shumaker did not serve as Lyric's attorney, and [] its representation of Lyric's landlord did not create a disqualifying conflict of interest in the bankruptcy case." *Id.*

### HQM

HQM operated nursing homes in Florida under leases with HCN; HCN served as landlord and owned the real estate on which the homes were situated. Shumaker never served as HQM's attorney—but, as with Lyric, Shumaker may have received payments from HQM pursuant to its contract with HCN. The payments would be for work Shumaker performed for HCN. *Id.* at 262.

The Probate Estates sued HQM in *Nunziata* and *Webb*, but HQM was dismissed from the lawsuits in 2009, two years prior to the Chapter 7 bankruptcy case here. Neither Wilkes nor the Trustee considered HQM a Target—that is, a transferee of THMI's assets—so HQM was not mentioned in the complaint Wilkes filed in the bankruptcy case to initiate the adversary proceeding. In sum, the Bankruptcy Court found that Shumaker's representation of HQM's landlord, HCN, did not create a conflict of interest in the bankruptcy case. *Id.*

Having concluded that Shumaker's legal representation of HCN and Shumaker's interactions with Lyric and HQM were, in effect, immaterial to its § 327(a) analysis, the Bankruptcy Court returned to Wilkes's contention that Shumaker failed to comply with Rule 2014 by omitting its representation of HCN from its initial disclosures. The Bankruptcy Court found no violation because

> Shumaker's representation of [HCN] was not adverse to the Probate Estates or to the bankruptcy estate [and] there [was] no evidence that Shumaker was aware of any alleged connection between [HCN] and the Probate Estates, or [HCN] and the bankruptcy estate, before [Wilkes] raised the issue in 2017. In other words, this [was] not a situation in which Shumaker knew of the alleged connections and deliberately chose not to disclose them, or in which Shumaker's conflict check system was wholly inadequate.

*Id.* at 263.

Based on the foregoing analysis, the Bankruptcy Court, on August 21, 2019, entered an order denying the motion for disqualification and disgorgement.

### C.

The Probate Estates appealed that order to the District Court. The District Court found no error in the Bankruptcy Court's conclusion that Shumaker's pre-petition connections with HCN, Lyric, and HQM did not create a disqualifying conflict of interest in the bankruptcy case under § 327(a).[88] *In re Fundamental Long Term Care, Inc.,* No. 8:19-cv-2176-T-33, 2020 WL 954982, at *8–9 (M.D. Fla. Feb. 27, 2020). The District Court did find error,

---

[88] Whether Shumaker's connections with HCN, Lyric, and HQM created a disqualifying conflict of interest under 11 U.S.C. § 327(a) presented a mixed question of fact and law. The District Court found no clear error in the Bankruptcy Court's fact findings regarding Shumaker's involvement with HCN, Lyric, and HQM and the entities' relationship to the bankruptcy estate.

however, in the Bankruptcy Court's analysis of the issues presented by the Probate Estates' argument that Shumaker violated Rule 2014.

The District Court began its discussion of the Bankruptcy Court's order denying Wilkes's motion for disqualification and disgorgement by noting that the Bankruptcy Court found that Shumaker did not violate Rule 2014 by omitting its representation of HCN in its initial disclosures. *Id.* at *11. The Bankruptcy Court reached this conclusion based on its finding that there was no evidence that Shumaker was aware of any alleged connection between HCN and the Probate Estates or between HCN and the bankruptcy estate. *Id.* This, the Bankruptcy Court added, was not a situation in which Shumaker knew of the alleged connections and deliberately chose not to disclose them, or one in which the operation of the conflict system in the Shumaker law office was wholly inadequate and thus could not be relied on. *Id.* In short, there was "no knowing violation of Rule 2014 by Shumaker." *Id.*

Although the District Court saw no error in the Bankruptcy Court's finding that Shumaker did not knowingly violate Rule 2014, it was concerned about what the order *did not* say. It was "unclear . . . whether the Bankruptcy Court considered a negligent or inadvertent nondisclosure after the initial disclosure was made." *Id.* at *12. As the District Court explained, the order was

> ambiguous . . . [and] otherwise silent as to whether the Bankruptcy Court analyzed—under a negligence lens—Shumaker's failure to identify and disclose potential connections between its 30-year, long term

> client and the bankruptcy estate, its creditors, and
> other parties of interest after the initial disclosures
> were made. Additionally, the [order was] silent as to
> the nondisclosures of connections to Lyric and HQM.

*Id.*[89]

The District Court therefore vacated the Bankruptcy Court's Rule 2014 ruling and remanded the matter to the Bankruptcy Court so it could consider the record through the negligence lens and determine, in the first instance: (1) whether there was "an unintentional, negligent and/or inadvertent nondisclosure" of Shumaker's connections to HCN, Lyric, and HQM; (2) whether a Rule 2014 violation occurred; (3) if so, whether sanctions were warranted; and (4) if sanctions were warranted, what type of sanctions would be warranted. *Id.* In all other respects, the District Court affirmed the order denying the motion for disqualification and disgorgement. *Id.* at *13.

### D.

On remand, the Bankruptcy Court complied with the District Court's mandate, answering the questions the District Court put to it:

> Th[is] Court has considered the record on remand
> and finds that Shumaker inadvertently and non-negligently failed to disclose all of its connections with the
> Debtor, creditors, or other interested parties in this

---

[89] The District Court appears to have overlooked the payments Lyric and HQM made to Shumaker pursuant to the lease agreements with HCN.

> case.  The Court further finds that no sanctions are warranted because the connections did not create a disqualifying conflict of interest, the nondisclosures were inadvertent, the connections were not material, Shumaker corrected the inadvertent nondisclosures, and Shumaker's representation of the Trustee greatly benefited the bankruptcy estate.

*In re Fundamental Long Term Care, Inc.*, 614 B.R. 753, 756 (Bankr. M.D. Fla. 2020).

After making these findings, the Bankruptcy Court explained how it reached them.  It did so after citing the disclosures Wilkes says Shumaker should have made.  Wilkes again alleged that Shumaker failed to disclose its connections with HCN, Lyric, and HQM pre-petition.  *See id.* at 757.

According to Wilkes, Shumaker's connections with these entities should have been revealed on June 1, 2012, in Shumaker's declaration of disinterestedness filed with the Trustee's application for approval of Shumaker's employment.  If not then, Wilkes argued, the disclosures should have been made at any of the following times: on March 22, 2013, in a supplemental disclosure in support of the application; on February 6, 2014, in an amended declaration of disinterestedness to accompany the Trustee's motion to modify the terms of Shumaker's retention as special counsel; or on July 27, 2016, in a notice related to continued disinterestedness.

Neither the first declaration nor any of the supplements Wilkes mentioned disclosed any connection between Shumaker and HCN, Lyric, or HQM.  The Bankruptcy Court found that "the

omission was inadvertent and not the result of negligence." *Id.* at 760–61. The case law did not explain what constitutes negligent nondisclosure under Rule 2014, so the Bankruptcy Court drew on Florida law in concluding that the omissions were not caused by negligence:

> Generally, . . . a misrepresentation is negligent under Florida law if the representor "should have known the representation was false." To state a claim for negligent misrepresentation, for example, a plaintiff must allege that the representation was made "without knowledge of its truth or falsity, or . . . under circumstances in which he ought to have known of its falsity."

*Id.* at 761 (footnote omitted).

In determining whether Shumaker was negligent, the Bankruptcy Court was mindful that:

> [U]nder Rule 2014, an attorney is not charged with the duty to disclose "every conceivable interpretation of its connections and possible consequence resulting from the connections; as well as a prediction of the outcome of any litigation that may result from, or be related to, the referenced connection." When an attorney seeks employment in a bankruptcy case, the disclosure required by Rule 2014 should not be "an impossible task subject to endless litigation over what would be enough."

*Id.* (footnotes omitted).

In the Bankruptcy Court's view, the record "d[id] not show that Shumaker knowingly omitted its connections with HCN, Lyric, and HQM from its Declarations," or that "Shumaker omitted the connections under circumstances in which it should have known of the requirement to disclose." *Id.*

The Bankruptcy Court considered whether Shumaker's supplemental disclosures—of May 4, 2018, after Wilkes raised the issue of Shumaker's potential conflict of interest, and on July 3, 2018, in a memorandum Shumaker filed in opposition to the motion for disqualification and disgorgement—cast light on Shumaker's declarations so that Shumaker should have known that it had been required to disclose its connections with HCN, Lyric, and HQM from the outset. The Bankruptcy Court found that the May 4 and July 3 supplemental disclosures contained nothing indicating that Shumaker, from the start, omitted disclosing its connections with those entities under circumstances in which it should have known that it had to disclose them.

Regarding HCN, the Bankruptcy Court reasoned:

The [May 4] Supplemental Disclosure include[d] the following representations with respect to HCN: (1) Shumaker did not represent HCN in the action commenced on behalf of the Townsend Estate, and therefore did not find any client representation adverse to the Debtor's creditors when it ran its conflicts checks; (2) Shumaker was never litigation counsel for HCN as against any of the Probate Estates; (3) Shumaker took only limited action as outside counsel in the

Townsend litigation by signing interrogatory responses, did not open a file for the Townsend litigation, and did not find any connection between the Townsend Estate and Shumaker in its conflicts checks; (4) none of the Probate Estates had any claim against HCN as of the date that the bankruptcy petition was filed; (5) neither Shumaker nor the Trustee knew of a connection between HCN and the Townsend Estate before the Probate Estates raised the issue in 2017; and (6) HCN was never a target of any potential litigation by the Trustee, and was never discussed by the Trustee or the Probate Estates' attorneys.

*Id.* at 761–62 (footnotes omitted).

Regarding Lyric, the May 4 disclosure revealed:

(1) Lyric was never Shumaker's client; (2) Shumaker's conflict system reflects that Lyric was an adverse party to HCN in corporate or real estate transactions that Shumaker worked on for HCN; (3) any payments received by Shumaker from Lyric likely represented reimbursement to HCN for charges that HCN had incurred; and (4) Lyric was never a target of any litigation by the Trustee in the bankruptcy case.

*Id.* at 762 (footnotes omitted).

In the memorandum from July 3, 2018, Shumaker "addressed the [Probate Estates'] allegations regarding HQM by stating that HQM [was] not its client, that HQM had leased real property from HCN upon which it operated nursing homes in Florida,

and that HQM was never a target of any litigation in the bankruptcy case." *Id.*

Taking the supplemental disclosures of May 4 and July 3 into account, the Bankruptcy Court found:

> Shumaker did not omit its connections with HCN, Lyric, and HQM under circumstances in which it should have known of the requirement to disclose. Shumaker did not represent HCN in any pre-bankruptcy litigation involving the Probate Estates, and none of HCN's pre-petition transactions ever surfaced as targets in the bankruptcy case despite exhaustive discovery and litigation. Lyric and HQM were not Shumaker's clients. Instead, they were adverse to Shumaker's client because of their landlord-tenant relationships.
>
> Shumaker performed its customary conflicts checks, and no conflict appeared in its files. There is nothing in the record to show that Shumaker disregarded flags that should have alerted it to the connections, that Shumaker's conflict check system is inherently flawed, or that Shumaker maintains the system in a manner that reflects poor intra-firm communication and data input.

*Id.*

After noting that circumstances involving a conflict check system may constitute grounds for finding an intentional violation of Rule 2014, the Bankruptcy Court then quoted *In re Fullenkamp*: "[G]iven the various relationships between the parties, the Court is

comfortable that [the] failure to discover the relationship was not . . . the result of a woefully inadequate conflict check system." *Id.* (quoting *In re Fullenkamp*, 477 B.R. 826, 834 (Bankr. M.D. Fla. 2011) (internal quotation marks omitted)).

Next, the Bankruptcy Court noted that

[i]n *Fullenkamp*, the Court concluded that the omission was inadvertent and did not rise to the level of a sanctionable nondisclosure. In this case, as in *Fullenkamp*, the record does not show that Shumaker initially omitted its connections to HCN, Lyric, and HQM under circumstances in which it should have known of the requirement to disclose. The omission was not the result of negligence.

*Id.* at 762–63 (footnote omitted).

Finally, the Bankruptcy Court addressed the question of sanctions. It concluded that "no sanctions [were] warranted for the omission because the connections did not create a disqualifying conflict, the omission was inadvertent, the connections were not material to the bankruptcy estate, Shumaker corrected the omissions, and Shumaker's representation provided a substantial benefit to the estate." *Id.* at 765–66.[90]

---

[90] Regarding sanctions—that is, the disgorgement the Probate Estates were seeking from Shumaker—the Bankruptcy Court noted that "any compensation recovered from Shumaker would be used to pay the balance of the attorney's fees or costs owed by the [Probate] Estates" to Wilkes and would not go

### E.

The Probate Estates appealed the Bankruptcy Court's resolution of the Rule 2014 liability issues to the District Court. Wilkes argued that the Bankruptcy Court: (1) abused its discretion in denying the Probate Estates an opportunity to conduct discovery on whether Shumaker's omission to disclose its pre-petition connections with HCN, Lyric, and HQM was unintentional, negligent, and/or inadvertent; (2) abused its discretion in failing to hold a hearing on whether such omission was unintentional, negligent, and/or inadvertent; and (3) used an inapplicable standard in determining whether such omission was unintentional, negligent, and/or inadvertent. *See In re Fundamental Long Term Care, Inc.*, No. 8:20-cv-956, 2021 WL 222779, at *3 (M.D. Fla. Jan. 22, 2021).

Addressing the first argument, the District Court recalled that, in the prior appeal, it "held that the Bankruptcy Court had a sufficient record to conclude that there was no intentional violation of Rule 2014." *Id.* (citing *In re Fundamental Long Term Care, Inc.*, 2020 WL 954982, at *11). Wilkes contended that that record was insufficient, though, to permit the Bankruptcy Court to determine that Shumaker's nondisclosure of its connections with HCN, Lyric, and HQM was an unintentional, negligent, or inadvertent nondisclosure. Wilkes also contended that the Bankruptcy Court's denial of its request to reopen discovery for the purpose of establishing a

---

to the Probate Estates themselves. *In re Fundamental Long Term Care, Inc.*, 614 B.R. at 755.

record sufficient to resolve that issue constituted an abuse of its right to discovery.

The District Court disagreed and held that the Bankruptcy Court did not err in limiting discovery on remand. *Id.* The District Court noted that the Bankruptcy Court was intimately familiar with the factual and procedural history of the case, which had spanned several years. "Discovery was voluminous, as evidenced by [Wilkes's] thirty-seven-page Motion to Disqualify and thirty-four attached exhibits, consisting of hundreds of pages. Shumaker's response also exceeded thirty pages and contained nineteen attached exhibits." *Id.* Elaborating on the record before the Bankruptcy Court, the District Court said:

> A negligence inquiry may differ from an intentionality inquiry, but these filings indicate the parties extensively briefed all facets of disqualification. The record provided the Bankruptcy Court with a thorough history of Shumaker's relationship with HCN, including the nature of previous legal representations, the precise legal tasks Shumaker performed for HCN, and how HCN affected Shumaker's conflict checks. The record likewise contained detailed information on Shumaker's interactions with Lyric and HQM, and how those entities appeared in the conflict system. The Bankruptcy Court was well within its discretion to base its decision on this information and to limit discovery it deemed unnecessary.

*Id.* (citations omitted).

Like its first argument, Wilkes's second argument asserted an abuse of discretion. Wilkes argued that the Bankruptcy Court should have held an evidentiary hearing because material issues of fact existed regarding Shumaker's failure to disclose its connections with HCN, Lyric, and HQM. Again, the District Court disagreed, reasoning that the extensive filings presented to the Bankruptcy Court in support of and in opposition to the motion to disqualify provided the Bankruptcy Court with "ample evidence" from which to make the findings the District Court requested. *Id.* at *4. The District Court then explained that "a bankruptcy judge 'does not abuse her discretion in reaching a decision without holding an evidentiary hearing where the record provided ample evidence on which the court could make such a decision.'" *Id.* (quoting *In re Garcia*, 532 B.R. 173, 182 (B.A.P. 1st Cir. 2015)). The District Court noted that this was not a case where the record was inadequate to allow the Bankruptcy Court to resolve disputed issues of material fact and it was "unnecessary to conduct an evidentiary hearing on a contested matter unless there are disputed issues of material fact that a Bankruptcy Court cannot decide based on the record." *Id.* (internal quotation marks and citation omitted).

Wilkes's third argument was that the Bankruptcy Court abused its discretion in relying on the negligent misrepresentation standard of Florida law in determining whether Shumaker's failure to disclose its pre-petition interactions with HCN, Lyric, and HQM

114                    Opinion of the Court                    21-10587

in its Rule 2014 disclosure was negligent.[91]  Because "Shumaker had an affirmative duty to disclose any relevant connections," Wilkes argued, "the correct analysis should have been one of reasonableness." *Id.*  "By erroneously appl[ying] the elements of the fraud-based tort of negligent misrepresentation, rather than conducting a reasonableness analysis, [Wilkes] claim[s] the Bankruptcy Court abused its discretion." *Id.* (first alteration in original) (internal quotation marks and citation omitted).

The District Court disagreed with Wilkes's characterization of the Bankruptcy Court's opinion.  According to the District Court:

> The Estates argue that the Bankruptcy Court focused "almost entirely on [Shumaker's] asserted lack of knowledge," but Shumaker's "purported lack of its undisclosed connections is not determinative to a negligence analysis."  Therefore, according to the Estates, the Bankruptcy Court used an incorrect legal standard because it "never analyzed the reasonableness of [Shumaker's] asserted lack of knowledge under the circumstances."
>
> But the Bankruptcy Court specifically examined the circumstances under which Shumaker failed to disclose its connections.  In concluding that the omission was not the result of negligence, the Bankruptcy

---

[91] Whether a court has misapplied the substantive law controlling its decision presents a question of law, not of discretion.  The District Court's analysis of the third argument correctly treated the negligence issue as a question of law.

Court not only considered what Shumaker purportedly knew through its conflict check system, but also noted that (1) Shumaker never represented HCN in any pre-bankruptcy litigation involving the Estates, (2) HCN never surfaced as a target in the bankruptcy action despite exhaustive discovery on potential targets, and (3) Shumaker never represented Lyric or HQM, but only dealt with them in an adverse posture as counsel for their landlords.

Based on Shumaker's purported knowledge at the time of the omissions, *and* these surrounding circumstances, the Bankruptcy Court held that the omissions were not made under circumstances in which Shumaker "should have known of the requirement to disclose." Therefore, the Court disagrees with the Estates' contention that the Bankruptcy Court entirely eschewed the issue of reasonableness. The Bankruptcy Court considered the circumstances in which the omission was made and concluded that under the circumstances, the omission was "not the result of negligence."

The Court disagrees that the use of a negligent misrepresentation standard constituted an abuse of discretion. As noted by the Bankruptcy Court, no case law explains what constitutes a negligent nondisclosure under Rule 2014. Even the Estates' cited case law states that there is "no clear definition of [the term negligence] in the context of discovery misconduct." Therefore, the Court cannot say that the Bankruptcy Court used a clearly incorrect legal standard in

evaluating Shumaker's omissions as negligent misrepresentations.

*Id.* at \*5 (alterations and emphasis in original) (citations omitted).

Based on what Shumaker knew at the time of the omissions and these surrounding circumstances, the Bankruptcy Court held that Shumaker's omissions "were not made under circumstances in which Shumaker 'should have known of the requirement to disclose.'" *Id.* (quoting *In re Fundamental Long Term Care, Inc.*, 614 B.R. at 763). The District Court therefore disagreed with Wilkes's claim that the Bankruptcy Court "entirely eschewed the issue of reasonableness." *Id.* "The Bankruptcy Court considered the circumstances in which the omission was made and concluded that under the circumstances, the omission was 'not the result of negligence.'" *Id.* (quoting *In re Fundamental Long Term Care, Inc.*, 614 B.R. at 763).

The District Court noted that, contrary to Wilkes's position, the Bankruptcy Court acted consistent with the instructions it was given on remand when it used a negligent misrepresentation standard. The Bankruptcy Court was instructed "to examine whether there was an 'unintentional, negligent and/or inadvertent nondisclosure by Shumaker.'" *Id.* (quoting *In re Fundamental Long Term Care, Inc.*, 2020 WL 954982, at \*13). "By definition, failing to disclose all relevant connections would be a negligent misrepresentation by omission." *Id.* Therefore, the District Court found itself unable to say that the Bankruptcy Court erred in evaluating Shumaker's omission under a negligent misrepresentation standard. *Id.*

21-10587                Opinion of the Court                117

In addition, the District Court agreed with Shumaker that

> the use of the negligent misrepresentation legal standard [was] consistent with the purpose of Rule 2014. The rule requires an applicant for appointment by the trustee to "state the specific facts showing . . . to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." . . . [T]his rule does not require attorneys to raise "every conceivable interpretation of its connections and possible consequence resulting from the connections, as well as a prediction of the outcome of any litigation that may result from, or be related to, the referenced connection."

*Id.* (citations omitted). The District Court concluded its consideration of Wilkes's third argument by holding: "Examining Shumaker's omission under a negligent misrepresentation standard (that is, whether Shumaker omitted the connections under circumstances in which it 'ought to have known of its falsity') [was] consistent with this purpose" and was not an abuse of discretion. *Id.* at \*6.

Based on the filings the parties submitted regarding Shumaker's Rule 2014 disclosures, the Bankruptcy Court had found that "there was no evidence showing Shumaker disregarded any red flags that should have alerted it to the connections or that the conflict system was inherently flawed, or that Shumaker

maintained the conflict system in a manner that reflects poor intra-firm communication and data input." *Id.* The District Court found no error in the Bankruptcy Court's conclusion that Shumaker's failure to disclose its connections with HCN, Lyric, and HQM was non-negligent and inadvertent. *Id.* The District Court therefore affirmed the Bankruptcy Court's denial of the motion for disqualification and disgorgement. *Id.* at *7.

## V.

The Probate Estates now appeal the District Court's decision affirming the Bankruptcy Court's April 16, 2020, order denying the motion for disqualification and disgorgement. They present five issues for our review; Shumaker presents three.[92] They

---

[92] The issues that the Probate Estates present are:

I. Whether the District Court erred in affirming the Bankruptcy Court's determination on remand when the District Court found that [Shumaker] did not dispute that it represented [HCN], or that [HCN] was the landlord and owner of [Lyric] at one time.

II. Whether the District Court erred in affirming the Bankruptcy Court's determination on remand that [Shumaker's] violations were nonnegligent.

III. Whether the District Court erred in affirming the Bankruptcy Court's use of a negligent misrepresentation standard rather than conducting a reasonableness analysis of [Shumaker's] violations.

IV. Whether the District Court erred in determining that the use of the negligent misrepresentation legal standard is

21-10587                 Opinion of the Court                          119

are essentially the same set of issues: (1) whether the District Court erred in affirming the Bankruptcy Court's decision that Shumaker did not have a disqualifying interest under 11 U.S.C. § 327(a); (2) whether the District Court erred in affirming the Bankruptcy Court's decision that Shumaker's omission in its Rule 2014 disclosures of its pre-petition connections with HCN, Lyric, and HQM was inadvertent and not negligent; and (3) whether the Bankruptcy Court abused its discretion in finding that sanctions were not warranted for the omission.[93]

---

consistent with the purpose of Federal Rule of Bankruptcy Procedure 2014.

V.   Whether the District Court erred in affirming the Bankruptcy Court's determination on remand that [Shumaker's] violations were inadvertent.

Appellants' Br. at 1.  Shumaker's brief presents the issues this way:

(1) whether the Bankruptcy Court abused its discretion when it found that Shumaker did not possess a disqualifying interest under 11 U.S.C. § 327(a), which finding was affirmed by the District Court; (2) whether the Bankruptcy Court abused its discretion when it found that Shumaker's omission of immaterial connections from its Rule 2014 disclosures was inadvertent and not negligent; and (3) whether the Bankruptcy Court abused its discretion when it found no sanctions were warranted for Shumaker's omissions.

Appellees' Br. at 2.

[93] Because we resolve the first two issues in Shumaker's favor, we need not consider the third issue.

In entertaining these issues, we sit as a second court of review. We therefore examine independently the factual and legal determinations of the Bankruptcy Court and employ the same standards of review the District Court employed. *In re Issac Leaseco, Inc.*, 389 F.3d 1205, 1209 (11th Cir. 2004). We review legal conclusions of the Bankruptcy Court or the District Court *de novo*, and we review the Bankruptcy Court's findings of fact for clear error. *In re Fin. Federated Title & Tr., Inc.*, 309 F.3d 1325, 1328–29 (11th Cir. 2002).

We review denials of motions for sanctions, disqualification, and disgorgement for abuse of discretion. *See In re Hood*, 727 F.3d 1360, 1363 (11th Cir. 2013) (sanctions); *Giles v. Garwood*, 853 F.2d 876, 878 (11th Cir. 1988) (disqualification); *S.E.C. v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) (disgorgement). "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination or bases an award upon findings of fact that are clearly erroneous." *Electro-Wire Prods., Inc. v. Sirte & Permutt, P.C.*, 40 F.3d 356, 359 (11th Cir. 1994) (internal quotation marks and citations omitted).

*A.*

Section 327(a) of the Bankruptcy Code provides that "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties." 11 U.S.C. § 327(a). The

concept of "adverse interests" appears twice in §327(a). First, counsel may "not hold or represent an interest adverse to the estate." Second, counsel must be a "disinterested person," which means that counsel may not, among other things, "have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders." *Id.* § 101(14)(C). The Bankruptcy Code does not define the phrase "hold or represent an interest materially adverse to the estate." Hence, as the Second Circuit observed, "[w]hether an adverse interest exists is best determined on a case-by-case basis." *In re Arochem Corp.*, 176 F.3d 610, 623 (2d Cir. 1999).

This appeal focuses on Shumaker's representation of HCN as outside counsel and whether Shumaker was "disinterested" given its relationship with HCN. As the Second Circuit observed:

> [S]ection 327(a) is phrased in the present tense, permitting representation by professionals "that do not *hold* or *represent* an interest adverse to the estate," and limiting the class of acceptable counsel to those "that *are* disinterested persons." 11 U.S.C. § 327(a) (emphasis added). . . . Thus, counsel will be disqualified under section 327(a) only if it presently "hold[s] or represent[s] an interest adverse to the estate," notwithstanding any interests it may have held or represented in the past. . . .
>
> This reasoning finds support in related portions of the Bankruptcy Code, which draw explicit distinctions between current and past relationships. For example, the Bankruptcy Code defines a "disinterested person" as a person that, among other things, "*is not and was*

*not* an investment banker for any outstanding security of the debtor," *see* 11 U.S.C. § 101(14)(B) (emphasis added); *"has not been, within three years before the date of the filing of the petition*, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor," *id.* § 101(14)(C) (emphasis added); and *"is not and was not, within two years before the date of the filing of the petition*, a director, officer, or employee of the debtor," *id.* § 101(14)(D) (emphasis added). The Bankruptcy Code thus recognizes a distinction between past and present representation.

*Id.* at 623–24 (alterations in original). We will assume for purposes of this appeal that § 327(a) applies to Shumaker's pre-petition *and* post-petition representation of HCN.

Wilkes begins the Probate Estates' argument on the first issue with this statement:

> The Bankruptcy Court and District Court erred when they concluded that [Shumaker] was disinterested and did not possess a disqualifying interest under § 327. In the underlying Disqualification Order, the Bankruptcy Court found that although *HCN owned the Auburndale Oaks nursing home* where the loved-ones of three of the six decedents of the [Probate]

Estates resided,[94] HCN was not adverse because HCN "had no involvement in the operation of the nursing home." However, the record before the District Court established that [Shumaker] "does not dispute that it represented HCN, or that HCN was the landlord *and* owner of Lyric [the operator of the nursing homes] at one time."

Appellants' Br. at 30 (fifth alteration in original) (first emphasis added) (citations omitted).

How could the District Court have held that Shumaker was disinterested and did not possess a disqualifying interest under § 327 in the face of Shumaker's admission that its client, HCN, owned the Lyric nursing home where six decedents resided? In Wilkes's telling, HCN was not just the landlord—it was the owner of the Auburndale Oaks facility. As such, the District Court—and the Bankruptcy Court earlier—inexplicably overlooked that HCN actually owned the nursing home.

---

94 The Probate Estates' opening brief is apparently referring to the following statement in the Bankruptcy Court's memorandum opinion denying their motion to disqualify and require disgorgement:

> [HCN] *owned the real property on which the Auburndale Oaks nursing facility was located*, but had no involvement in the operation of the nursing home. [HCN] was initially named as a defendant in a wrongful death action brought by one of the Probate Estates, but was dismissed from the action with prejudice before the bankruptcy case was filed.

*In re Fundamental Long Term Care, Inc.*, 605 B.R. at 258 (emphasis added).

Did Wilkes call this "oversight" to the District Court's attention and move it to reconsider its conclusion that Shumaker was disinterested? No. It made a strategic decision. Because Wilkes's motion would have been rejected out of hand, Wilkes did not move the District Court to reconsider its affirmance of the Bankruptcy Court's finding that Shumaker's representation of HCN did not disqualify Shumaker from serving as the Trustee's counsel. The notion that HCN owned the Auburndale Oaks nursing home was squarely refuted by the evidentiary record in the Bankruptcy Court and the Bankruptcy Court's findings of fact based on that record. Wilkes chose instead to forego moving the District Court for reconsideration and ask this Court, on appeal, to declare Shumaker bound by the "Shumaker does not dispute" statement under the doctrine of judicial estoppel.

The District Court would have rejected any such motion for reconsideration brought by the Probate Estates for the same reasons the District Court gave in its order affirming the Bankruptcy Court's finding on the ownership of the Auburndale Oaks nursing home issue. *See In re Fundamental Long Term Care, Inc.*, 2020 WL 954982. The District Court recalled those reasons in the order we review today. *In re Fundamental Long Term Care, Inc.*, 2021 WL 222779.

The District Court cited the Probate Estates' motion for disqualification and disgorgement, which was based on Shumaker's representation of HCN and HCN's connection to Lyric among others. "In the [motion], the [Probate] Estates argued that Shumaker

had a long-standing relationship with [HCN], a real estate invest-
ment trust. At the time of the bankruptcy proceedings, Shumaker
had acted as HCN's general counsel for over thirty years." *Id.* at \*1
(citations omitted). The District Court then recited what the evi-
dentiary record in the Bankruptcy Court revealed and why in de-
ciding the Probate Estates' earlier appeal it agreed with the Bank-
ruptcy Court that Shumaker, in representing HCN, had not pos-
sessed a disqualifying interest under § 327(a):

> HCN *owned and leased the real property* to some of the
> nursing homes involved in the wrongful death ac-
> tions. Specifically, [HCN] had connections to THI,
> THMI, and the related company THI Holdings, all of
> which were litigation targets in the underlying bank-
> ruptcy proceedings. HCN also had connections with
> [*Lyric*] *and* [*HQM*]*, which operated* the nursing homes
> where some of the deceased residents lived.

> The [Probate] Estates argued that (1) these connec-
> tions constituted representations of adverse interests,
> disqualifying Shumaker under Section 327(a), and (2)
> Shumaker violated Rule 2014 by failing to disclose
> these connections in its initial declaration of disinter-
> estedness.

> The Bankruptcy Court denied the Motion to Disqual-
> ify (Disqualification Order) on August 21, 2019, find-
> ing that Shumaker did not possess a disqualifying in-
> terest under Section 327(a) and that Shumaker's omis-
> sions in the initial disclosures did not violate Rule
> 2014. The [Probate] Estates appealed the decision.

126                    Opinion of the Court                    21-10587

On appeal, this Court adopted and affirmed the Disqualification Order "in all respects except to the extent the Bankruptcy Court found no violation of the disclosure requirements of Rule 2014."

*Id.* at *1–2 (emphasis added) (citations omitted).

The District Court could have gone further in elaborating on Shumaker's representation of HCN and HCN's connections with Lyric and others involved in the nursing home industry by quoting from the Bankruptcy Court's order denying the motion for disqualification and disgorgement. *See In re Fundamental Long Term Care, Inc.*, 605 B.R. 249 (Bankr. M.D. Fla. 2019). The order presented the Bankruptcy Court's holding at the outset and then explained it.

The holding:

[HCN] owned the real property on which certain nursing homes were located, but had no involvement in the operation of the facilities. Additionally, despite exhaustive investigation, neither the Probate Estates nor the Chapter 7 Trustee ever considered [HCN] as potentially liable to the bankruptcy estate because of any prepetition transactions. Accordingly, Shumaker's representation of [HCN] was not adverse to the Probate Estates or the bankruptcy estate.

*Id.* at 252.

The explanation:

[HCN] is a real estate investment trust with its principal place of business in Toledo, Ohio. In the sworn

Supplemental Disclosure, Berman stated that the "only tangential connection between [HCN] and any of the Probate Estates, [is that] on or about June 30, 2005, . . . [HCN] purchased the real property located at 919 Old Winter Haven Road, Auburndale, Florida—the location of the Auburndale Oaks facility in which Ms. Townsend and Ms. Jackson resided for a period of time (the 'Auburndale Oaks Property')."

But [HCN] *did not operate the Auburndale Oaks nursing home. It leased the Auburndale Oaks Property* to a tenant (one of the Lyric entities) that operated the nursing home. In an Affidavit filed in state court in 2010, a Vice President of [HCN] stated:

> 6. [HCN] leased the Real Property to Lyric Health Care Holdings III, Inc. ("Tenant") on June 30, 2005.
>
> 7. [HCN] serves only as a Landlord to its Tenant for the Real Property.
>
> 8. [HCN] *does not control the services provided by its Tenants* or its Tenant's agents, employees or representatives. *It does not operate, nor has it ever operated, Auburndale Oaks Healthcare Center*, nor does it control, nor has it ever controlled, the services provided by Auburndale Oaks Healthcare Center, its agents, employees or representatives.
>
> 9. [HCN] has never had any control over the hiring, supervision, or

management of employees at Auburndale Oaks Healthcare Center and it does not administer, direct, supervise, or provide health care or skilled nursing services at any facility, including Auburndale Oaks Healthcare Center.

Even though [HCN] *had no involvement in the operation of the nursing home*, the Probate Estates contend that it was potentially liable to the residents of Auburndale Oaks because its lease required the tenant/operator to provide [HCN] with certain financial and licensing documents.  But the Probate Estates provide no authority for the proposition that a property owner is liable for a tenant nursing home's negligence.  Further, even if such potential liability did exist, Ms. Townsend's estate is the only party that asserted a claim against [HCN], and that claim was dismissed with prejudice.

Specifically, [HCN] was named as a defendant in the wrongful death action filed by the Townsend Estate in state court in 2009.  In the sworn Supplemental Disclosure, Berman states that Shumaker did not represent [HCN] in the action by the Townsend Estate, took only limited action in the case consistent with its role as outside general counsel, did not take any action related to the substantive claims in the case, and did not open a file for the litigation.

In January 2011, Townsend's Estate filed a Notice of Voluntary Dismissal of [HCN] from the action without prejudice.  In August 2011, more than three

months before the bankruptcy case was filed, the state court entered an order dismissing the action against [HCN] with prejudice.

In summary, [HCN] *owned the real property on which the Auburndale Oaks nursing facility was located, but had no involvement in the operation of the nursing home.* [HCN] was initially named as a defendant in a wrongful death action brought by one of the Probate Estates, but was dismissed from the action with prejudice before the bankruptcy case was filed. For these reasons, [HCN] is not adverse to the Probate Estates, and Shumaker's representation of [HCN] did not lessen the value of the bankruptcy estate, create a potential dispute between the bankruptcy estate and [HCN], or create a circumstance that would generate a bias against the bankruptcy estate.

*Id.* at 257–58 (third alteration in original) (emphasis added) (footnotes omitted).

The order denying Wilkes's motion states that HCN "owned *the real property* on which the Auburndale Oaks nursing facility was located." *Id.* at 258 (emphasis added). So what did Wilkes find to support its statement that: "In the underlying [order,] the Bankruptcy Court found that . . . HCN owned the Auburndale Oaks nursing home"? Appellants' Br. at 30. And its statement that: "[Shumaker] does not dispute that it represented HCN, or that HCN was the landlord **and** owner of Lyric [the operator of the nursing homes] at one time"? *Id.* (emphasis in original).

The first statement is squarely contradicted in both the Bankruptcy Court's order and the District Court's order affirming it. The Bankruptcy Court's order is replete with unassailable statements that HCN owned *the real estate* on which nursing homes, including the Auburndale Oaks nursing home, were located—not the nursing homes themselves.[95] The order also notes that the homes were operated by lessees like Lyric, not HCN, their landlord. The statement that HCN owned the Auburndale Oaks facility was not made by the Bankruptcy Court or the District Court in the decision on review here.

The second statement was in the record before the District Court, as the Probate Estates' brief represents, but the words, "[Shumaker] does not dispute that it represented HCN, or that HCN was the landlord **and** owner of Lyric [the operator of the nursing homes] at one time," *id.*, do not appear in the underlying order denying Wilkes's motion or the District Court order affirming it (as to the § 372(a) issues) or the District Court's order here on appeal. Rather, the second statement appears in an order the District Court entered on September 25, 2020, while the Probate Estates' appeal of the Bankruptcy Court's order was pending. *See Estate of Arlene Townsend v. Shumaker*, No. 8:20-cv-956-T-33, 2020 WL 10318565, at *1 (M.D. Fla. Sept. 25, 2020).

---

[95] The statements are unassailable because the District Court, in affirming the Bankruptcy Court's disposition of the §327(a) disqualification issue, found the statements supported by the evidence and thus not clearly erroneous. *See generally In re Fundamental Long Term Care, Inc.*, 2020 WL 954982.

The September 25 order denied Wilkes's motion to supplement the Bankruptcy Court's record with a "Closing Checklist" that, according to Wilkes, would show "Shumaker's relationship with [HCN], the landlord and owner of two nursing homes involved in this action." *Id.* at *1. The September 25 order contained this statement: "Shumaker does not dispute that it represented HCN, or that HCN was the landlord and owner of Lyric at one time."[96] *Id.* at *2.

As indicated *supra*, Wilkes did not move the District Court to reconsider its affirmance of the Bankruptcy Court's finding that HCN neither owned Lyric nor operated the Auburndale Oaks facility. A finding that HCN did own and operate the facility was critical to the Probate Estates' position. It went to the heart of their motion for disqualification and disgorgement and is the *sine qua non* of their disqualification argument here. If the Probate Estates had

---

[96] The District Court entered its order deciding the Probate Estates' appeal of the Bankruptcy Court's April 16, 2020, order on January 22, 2021. *In re Fundamental Long Term Care, Inc.,* 2021 WL 222779. After making the statement quoted above, the order went on to state:

> The only issues before the Court on appeal are whether the Bankruptcy Court abused its discretion in determining that the failure to mention this connection was inadvertent and non-negligent, and that the omission did not warrant sanctions. The Closing Checklist does nothing to further this inquiry, as it merely confirms the relationship all parties agree existed. In short, the Court "is not convinced that supplementing the record will assist it in deciding this appeal."

*Estate of Townsend v. Shumaker*, 2020 WL 10318565, at *2 (citation omitted).]

moved the District Court to reconsider, we have no doubt the District Court would have gotten to the bottom of the apparent inconsistency—created by the "Shumaker does not dispute" statement and the Bankruptcy Court's contrary statements in *In re Fundamental Long Term Care, Inc.*, 605 B.R. 249—and held an evidentiary hearing.[97]  Shumaker contends that the statement from the September 25 order was a pure scrivener's error that the District Court simply didn't catch.  Appellees' Br. at 21.  Shumaker could have brought the error to the District Court's attention but neglected to do so.

So we are faced with an argument Wilkes chose not to present to the District Court on behalf of the Probate Estates and Shumaker's neglect in failing to point the District Court to what it believed was a scrivener's error.  Because Shumaker "never objected to or denied this statement by the District Court," Wilkes contends that Shumaker is judicially estopped from contending here that HCN did not own and operate the Auburndale Oaks nursing home.  Appellants' Br. at 30.  It matters not to Wilkes whether the "Shumaker does not dispute" statement was a scrivener's error.  "The equitable doctrine of judicial estoppel is intended to protect courts against parties who seek to manipulate the judicial process by changing their legal positions to suit the exigencies of the moment."  *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1176 (11th

---

[97] We assume that at such a hearing, Shumaker would introduce the documents establishing HCN's ownership of the real estate, and its leases with those owning and operating the nursing homes, into evidence.

21-10587               Opinion of the Court               133

Cir. 2017) (en banc).  According to Wilkes, that is what Shumaker is doing here—manipulating the judicial process.

In considering whether the judicial estoppel doctrine should be invoked, Wilkes would have us start with Shumaker's "does not dispute" position, as reflected in the District Court's September 25 order: HCN owned and operated the Auburndale Oaks nursing home.[98]  Wilkes says that the manipulation of the judicial process occurred when Shumaker took the position he advances here, on appeal: HCN did not own and operate the Auburndale Oaks facility.  According to Wilkes, Shumaker changed its position as indicated in the September 25 order "to suit the exigencies of the moment."

What Wilkes ignores is that the position Shumaker took— as reported in the September 25 order—was directly contrary to the position Shumaker had taken successfully at the hearing on the motion for disqualification and disgorgement in the Bankruptcy Court and in the District Court on appeal.  If the doctrine of judicial estoppel was in effect on September 25, 2020, Shumaker's

---

[98] The doctrine of judicial estoppel would not work for the Probate Estates if we started with the position Shumaker took throughout the litigation over the motion for disqualification and disgorgement: HCN owned the real estate on which the nursing home was located, while Lyric leased the land, created the nursing home, and thereafter operated it.

position as announced that day abused the judicial process[99] and should be disregarded as manipulative of that process.

We are unaware of a situation like the one here, and Wilkes has not cited one. Wilkes describes the instant scenario as follows. A party's lawyer fails to call to a court's attention a statement in the court's order that, in the party's view, misstates the party's legal position and under the circumstances had to be a scrivener's error. Despite the misstatement, the party prevails. On appeal, when the party's adversary relies on the statement as written in the order, the party objects, explains why it believes the statement is a scrivener's error, and takes the legal position it had been taking prior to the entry of the order. The adversary responds. Judicial estoppel bars the party from changing the legal position attributed to it in the order.

Judicial estoppel is an equitable doctrine. It applies when a party advances a legal or factual position in one court, and the court relies on the position in deciding an issue. At the same time or later in another court, the party advances an entirely new legal or factual position—one that is contrary to the position advanced in the first court. That is not the case here. We would be hard pressed to say that equity requires that we accept Wilkes's argument.

---

[99] If the statement that Wilkes points to was not a scrivener's error, Shumaker abused the judicial process because its statement was flatly contrary to the position it previously took in the Bankruptcy Court and in the District Court on appeal.

We therefore hold that Shumaker was not disqualified from representing the Trustee of the Debtor's (FLTCI's) estate by virtue of its pre-petition representation of HCN or HCN's connections with Lyric, HQM, or any of the other entities Wilkes has identified as rendering Shumaker disqualified. And we find nothing relating to Shumaker's post-petition representation of HCN that disqualified Shumaker from representing the Trustee. Shumaker's representation of HCN did not lessen the value of the bankruptcy estate, create a dispute between the bankruptcy estate and HCN, or create a circumstance that could be considered a bias against the bankruptcy estate. We therefore affirm the District Court's order as it relates to Shumaker's alleged disqualification under § 327(a).

*B.*

We turn now to the second issue this appeal presents: whether the District Court erred in affirming the Bankruptcy Court's decision that Shumaker's omission in its Rule 2014 disclosures of its pre-petition connections with HCN, Lyric, and HQM was inadvertent and not negligent.

The District Court remanded the disqualification issue to the Bankruptcy Court with this instruction: "to determine, in the first instance, if there was an unintentional, negligent and/or inadvertent nondisclosure by Shumaker." *In re Fundamental Long Term Care, Inc.*, 2020 WL 954982, at *13. Whether the nondisclosure was negligent called for the determination of a mixed question of fact and law. Thus, an error would occur if the Bankruptcy Court

applied the wrong legal standard for negligence or committed clear error in making its factual findings.

Wilkes argues that the Bankruptcy Court made an error of law. The Bankruptcy Court, according to Wilkes, "erroneously applied a negligent misrepresentation standard under Florida law to analyze [Shumaker's] conduct, rather than negligence standard." Appellants' Br. at 37. And, Wilkes contends, the District Court erred in not vacating the Bankruptcy Court's decision and remanding the case for further proceedings. *See id.* at 26.

This is essentially the same argument Wilkes made to the District Court. Berman and Shumaker had a "duty to thoroughly investigate and disclose any connections that might be relevant to their disinterestedness." *Id.* at 42. Whether their investigation was "reasonable" under the circumstances would determine whether they were negligent. *See id.* at 43. In Wilkes's view:

> It was and is manifestly unreasonable that, [Shumaker] failed to disclose the true nature of its HCN relationship which, at a minimum, included: (1) HCN and [Shumaker]'s status as litigation adversaries to the Townsend Estate just prior to Berman's employment; (2) *HCN's ownership* at the time of Berman's employment *of the nursing homes where four of the six Creditor Estates' decedents resided* and were injured; and (3) [Shumaker]'s role in drafting HCN's master lease agreement governing the subject-nursing homes at issue in this bankruptcy. That the HCN connections went undisclosed for so long implies an unreasonable

> lack of disclosure, or an unreasonable system for compliance with Rule 2014.

*Id.* at 43–44 (emphasis added). The first item is inaccurate and meaningless. HCN was an adversary purely on paper, added to the complaint by Wilkes in shotgun fashion, and was ultimately dismissed from the case. Shumaker did not enter the case as HCN's counsel. The second item, as previously discussed, was false.

The District Court disagreed with Wilkes's treatment of the Bankruptcy Court's order—thus addressing the third item:

> [T]he Bankruptcy Court specifically examined the circumstances under which Shumaker failed to disclose its connections. In concluding that the omission was not the result of negligence, the Bankruptcy Court not only considered what Shumaker purportedly knew through its conflict check system, but also noted that (1) Shumaker never represented HCN in any pre-bankruptcy litigation involving the Estates, (2) HCN never surfaced as a target in the bankruptcy action despite exhaustive discovery on potential targets, and (3) Shumaker never represented Lyric or HQM, but only dealt with them in an adverse posture as counsel for their landlords.

*In re Fundamental Long Term Care, Inc.*, 2021 WL 222779, at *5 (citations omitted). The District Court found that the Bankruptcy Court fully considered the circumstances under which the alleged failure to disclose occurred and concluded that the failure was not the result of negligence. *Id.* We agree with the District Court's conclusion and accordingly affirm its judgment.

## VI.

In conclusion, Chief Judge Williamson was right: this expansive and decade-plus dispute is, at its heart, a fraudulent transfer case. Wilkes, in representing the Probate Estates, sought huge sums in the form of damages in state court against the companies affiliated with the decedents' nursing homes. After having received one multimillion-dollar judgment in *Jackson*, Wilkes realized that the powers that be in the THI corporate structure had executed a bust-out scheme to separate THMI's liabilities from its assets and to hide those assets to avoid paying the *Jackson* judgment—as well as any potential future judgments awarded to the other estates.

Upon learning of this scheme, which THI and company went to great lengths to hide, Wilkes could still have obtained some recovery for its clients by placing THMI in Chapter 7 bankruptcy or by pursuing fraudulent transfer actions against FLTCH and the Targets. This likely would have resulted in a smaller total recovery for the Probate Estates—and smaller attorney's fees—because a bankruptcy court, rather than a jury, would evaluate the Estates' claims. Instead, Wilkes concocted a scheme of its own in which it placed FLTCI—THMI's assetless parent company—into Chapter 7 bankruptcy. Once the Bankruptcy Court appointed a trustee for FLTCI, Wilkes could then use the Trustee and the Trustee's strong-arm power to enhance its own discovery and pursue causes of action that it would not be able to pursue alone, attempting to get at THMI's assets through FLTCI.

Though this scheme was an abuse of the bankruptcy process, it appeared to work for Wilkes, until the final compromises were approved and Wilkes saw how much less in attorney's fees it stood to earn—receiving far less than it stood to receive as contingency fees for roughly $2 billion in state court judgments. Wilkes then turned on the Trustee, Shumaker, and the Bankruptcy Court, seeking Chief Judge Williamson's recusal, as well as Shumaker's disqualification as the Trustee's special counsel and disgorgement of the fees Shumaker received. The Bankruptcy Court held that Shumaker was disinterested, as required by 11 U.S.C. § 327(a), and that sanctions were not warranted because any violation of Rule 2014 was non-negligent. The District Court agreed.

Not only do we agree with the Bankruptcy and District Courts' reasoning, but when this saga is viewed as a whole, it is clear that the idea that Shumaker had a bias *against* Wilkes and the Probate Estates is baseless; if anything, Shumaker acted in a way that suggested a bias *toward* Wilkes and the Probate Estates.

The judgment of the District Court is therefore

**AFFIRMED**.